THE STATE OF OHIO, APPELLEE, *v.* CUNNINGHAM, APPELLANT.

[Cite as *State v. Cunningham,* 105 Ohio St.3d 197, 2004-Ohio-7007.]

*Criminal law – Aggravated murder – Death penalty upheld, when.*

(No. 2002-1377 — Submitted October 26, 2004 — Decided December 29, 2004.)

APPEAL from the Court of Common Pleas of Allen County, No. CR2002-0010.

_____

PFEIFER, J.

{¶ 1} On January 3, 2002, in Lima, Ohio, Jeronique D. Cunningham, defendant-appellant, and his half-brother, Cleveland Jackson Jr., robbed a group of eight people and then fired their weapons into the group from close range. Three-year-old Jayla Grant and 17-year-old Leneshia Williams died of gunshot wounds. A jury convicted Cunningham of the aggravated murders of Grant and Williams and sentenced him to death.

{¶ 2} In the early afternoon of January 3, 2002, Cunningham met his friend, LaShane ("Shane") Liles, at the home of Cunningham's sister, Tara Cunningham. After discussing a drug transaction, Shane and Cunningham went to Shane's apartment on East Eureka Street, in Lima, where Shane sold Cunningham crack cocaine.

{¶ 3} Later that afternoon, Tara saw Cunningham and Jackson. According to Tara, Cunningham "was wiping off a gun and Jackson was wiping off a clip with bullets in it." Tara heard Jackson tell Cunningham that he was going to "hit a lick," i.e., rob somebody, and Jackson mentioned Shane Liles.

{¶ 4} In the evening of January 3, Cunningham and Jackson went to Shane's apartment. Shane was not home, but several family members and friends were there. Shane came home shortly thereafter, and Cunningham told Shane that Jackson wanted to purchase drugs. Shane and Jackson then talked about drugs on

the staircase near the living room. While Shane and Jackson talked, Cunningham sat in the living room and watched a movie with teenagers Coron Liles and Dwight Goodloe Jr.

{¶ 5} As Shane and Jackson continued to talk, Cunningham stood up and ordered Coron and Goodloe into the kitchen. When Coron and Goodloe did not immediately obey, Cunningham, who was wearing gloves, pulled out a gun and struck Coron in the face with the gun barrel, breaking his jaw. When Cunningham hit Coron, Jackson pulled out his gun and aimed it at Shane. Coron and Goodloe then ran into the kitchen followed by Cunningham pointing his gun at them. Tomeaka Grant, Armetta Robinson, James Grant, his three-year-old daughter, Jayla, and 17-year-old Leneshia Williams were already in the kitchen.

{¶ 6} Cunningham held the group at gunpoint. The group huddled together against the back wall and tried to shield themselves behind the kitchen table. Cunningham pushed the table and chairs away, locked the back door, and checked the basement for other people. People in the group were crying and praying, and James repeatedly pleaded with Cunningham not to hurt Jayla.

{¶ 7} Meanwhile, Jackson forced Shane upstairs and robbed him of money and drugs. Jackson then tied Shane's hands behind his back and forced him into the kitchen at gunpoint. In the kitchen, the group was ordered to place money, jewelry, and watches on the table. Cunningham and Jackson grabbed some items from the table and put them into their pockets. Jackson believed that they had more money and asked Shane for the rest. When Shane said that was all he had, Jackson shot Shane in the back.

{¶ 8} Cunningham and Jackson then fired their weapons at the rest of the group. Goodloe testified that he saw Coron's head "snap back" when Cunningham shot Coron in the mouth. Goodloe also heard Cunningham's gun fire "numerous times" and saw smoke coming from Cunningham's gun. Coron testified that Cunningham pointed his gun at him and fired. Coron also saw

2

Cunningham shoot Jayla and Tomeaka. Coron said that both Cunningham and Jackson had fired their weapons, and he saw sparks coming from Cunningham's gun. Tomeaka saw Cunningham and Jackson pulling the triggers of their guns and heard more than one gun firing. James was holding Jayla when Cunningham pointed the gun and shot him in the face. Once the shooting stopped, the victims heard clicking sounds as Cunningham and Jackson continued pulling the triggers of their guns even after they were out of bullets.

{¶ 9} The deputy coroner determined that Jayla Grant and Leneshia Williams had been killed by gunshot wounds to the head. Jayla was shot twice in the head; either wound would have been fatal. One bullet went through her brain; the other penetrated her scalp, causing a skull fracture and a brain contusion. Leneshia suffered a gunshot wound to the back of her head. The bullet traveled through her brain; she died within seconds of being shot. The coroner recovered no bullets or bullet fragments from the victims during the autopsies and was unable to identify the caliber of the bullets that caused the deaths.

{¶ 10} The surviving victims all suffered gunshot injuries as well. Shane suffered a gunshot wound to his back. Robinson was shot in the back of the head and was in a coma for 47 days. James was shot five times and sustained injuries to his head, arm, and hand. Tomeaka was shot in the head and arm and lost her left eye. Coron was shot in the mouth, lost teeth, and sustained other injuries to his mouth. A bullet grazed Goodloe's side near his rib.

{¶ 11} Eight spent shell casings and five spent bullets were found at the scene. One fragmented lead core from a full-metal-jacketed bullet was also recovered. One bullet from the shooting was still lodged in Tomeaka's arm, and Coron testified that he had spit a bullet from his mouth outside the apartment after the shooting stopped. This bullet was never found. Police photographed and recovered a bullet from the front porch of the apartment, but this bullet was subsequently misplaced.

**{¶ 12}** John Heile, a firearms expert for the Bureau of Criminal Identification and Investigation, performed testing on the shell casings and bullets recovered from the scene, but no guns were recovered for testing. Heile was able to identify the spent shell casings and bullets recovered as .380-caliber ammunition. Heile testified that state's exhibits 10-17 (shell casings) and exhibits 18, 19, 21, and 23 (spent bullets) were all fired from the same semiautomatic pistol. Exhibit 20 was the same caliber and possessed the same general characteristics (e.g., lands and grooves) as the other spent bullets, but Heile could not confirm that it came from the same weapon. In addition, Heile was unable to identify the caliber of exhibit 22 (fragmented lead core) or determine whether it came from the same weapon as the other spent bullets.

**{¶ 13}** At trial, the defense presented testimony from three witnesses. William Reiff, a local gun dealer, testified regarding the differences between semiautomatic pistols and revolvers. Reiff explained that a semiautomatic weapon is loaded by inserting a magazine (i.e., clip) through the butt of the gun handle. Reiff also testified that a larger weapon, such as a .44-caliber, is "considerably louder" than a .380-caliber weapon and that .44-caliber bullets are much larger than .380-caliber bullets. On cross-examination, Reiff admitted that he did not know which type of gun was used in the shootings. He also acknowledged that a .380-caliber bullet has approximately the same diameter as a .38 bullet and that .38 rounds are generally fired from a revolver.

**{¶ 14}** Joann Davis and her daughter, Mary, lived next door to Shane's apartment, and both testified that they did not hear any noises at the time of the shootings. On cross-examination, Joann said that she was taking medication that night for congestive heart failure and a severe back condition. She also verified that there is a concrete firewall between her apartment and Shane's.

**{¶ 15}** The defense did not dispute that Cunningham brandished a gun both before and during the shootings. The defense's theory was that

4

Cunningham's gun was inoperable and that he had neither planned nor intended to kill anyone. The defense relied heavily on the physical evidence found at the scene in arguing that only Jackson had fired a weapon. At trial, witnesses unequivocally recalled a revolver in Cunningham's hands and a semiautomatic pistol with a clip in Jackson's hands. The bullet casings and spent bullets recovered from the scene, except exhibit 22, were all identified as .380-caliber ammunition that is typically fired from a semiautomatic handgun, not from a revolver.

{¶ 16} Cunningham was indicted on two counts of aggravated murder. Count One charged Cunningham with purposely causing the death of Jayla Grant during an aggravated robbery. Count Two charged Cunningham with purposely causing the death of Leneshia Williams during an aggravated robbery. R.C. 2903.01(B). Cunningham was charged with aggravated robbery in Count Three and with six counts of attempted murder in Counts Four through Nine. Cunningham was also charged with having a weapon under disability in Count Ten, but this charge was dismissed.

{¶ 17} The aggravated-murder counts each contained two death-penalty specifications. The first specification charged aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons. R.C. 2929.04(A)(5). The second specification charged aggravated murder during an aggravated robbery and that the murder was committed with prior calculation and design. R.C. 2929.04(A)(7). Firearm and repeat-violent-offender specifications were attached to all counts except Count Ten.

{¶ 18} The jury convicted Cunningham of all charges, the death-penalty specifications, and the firearm specifications. After a penalty hearing, the trial court sentenced Cunningham to death on Counts One and Two consistent with the jury's recommendation. The trial court imposed consecutive sentences of ten years each for Cunningham's convictions of aggravated robbery and six counts of

attempted murder, plus three-year consecutive sentences for the firearm specifications. Pursuant to R.C. 2941.149, the trial court determined that Cunningham was a repeat violent offender, sentenced him to nine years on each specification, and ordered those sentences to run concurrently with each other but consecutively to the 13-year sentences for Counts Three through Nine.

{¶ 19} This cause is now before this court on an appeal as of right.

## PRETRIAL ISSUES

*Voir Dire*

{¶ 20} In proposition of law IV, Cunningham asserts that the trial court unduly restricted defense counsel's voir dire of prospective jurors. Cunningham contends that the trial court precluded defense counsel from inquiring into prospective jurors' willingness and ability to consider mitigating factors and, as a result, it is likely that an automatic-death-penalty juror served on the jury.

{¶ 21} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212. A trial court has " 'great latitude in deciding what questions should be asked on voir dire.' " *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292, quoting *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493. Crim.R. 24(A) requires that counsel be given an opportunity to question prospective jurors or to supplement the court's voir dire examination. Accord R.C. 2945.27. Restrictions on voir dire have generally been upheld, and absent a clear abuse of discretion, prejudicial error cannot be assigned to the examination of the venire. *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674; *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274.

{¶ 22} Defense counsel waived any potential error by failing to challenge any seated juror's views on capital punishment. See *State v. Smith* (1997), 80 Ohio St.3d 89, 105, 684 N.E.2d 668, citing *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

Cunningham also cannot show prejudice, because he approved the jury selected before exhausting his peremptory challenges. *State v. Broom* (1988), 40 Ohio St.3d 277, 287-288, 533 N.E.2d 682; *State v. Watson* (1991), 61 Ohio St.3d 1, 16, 572 N.E.2d 97. See, also, e.g., *State v. Getsy* (1998), 84 Ohio St.3d 180, 191, 702 N.E.2d 866.

{¶ 23} The trial court did not unduly limit counsel's opportunity to question prospective jurors regarding their views on capital punishment. A review of the transcript reveals that the trial court placed few restrictions on counsel during voir dire. The trial court allowed defense counsel to ask prospective jurors whether they would automatically vote for the death penalty, whether they were willing to fairly consider all mitigating factors raised by the defense, as well as all available sentencing options, and whether they would evaluate all evidence before making a sentencing determination.

{¶ 24} The trial court precluded defense counsel from questioning prospective jurors about their views on specific mitigating factors. We have rejected past attempts to find error in such restrictions. See *State v. Jones* (2001), 91 Ohio St.3d 335, 338, 744 N.E.2d 1163 (trial court is under no obligation to discuss, or permit the attorneys to discuss, specific mitigating factors); *State v. Wilson,* 74 Ohio St.3d at 385-387, 659 N.E.2d 292 (no abuse of discretion occurred when the trial court declined to allow defense counsel to query prospective jurors about specific statutory mitigating factors); *State v. Lundgren* (1995), 73 Ohio St.3d 474, 481, 653 N.E.2d 304 (jurors cannot be asked to weigh mitigating factors until they have heard all the evidence and been fully instructed on the applicable law). Although defense counsel were precluded from asking questions regarding specific mitigating factors, counsel were not prevented from gauging prospective jurors' views on the death penalty or from exposing faults that would render a juror ineligible. See *Wilson,* 74 Ohio St.3d at 386, 659 N.E.2d 292.

**{¶ 25}** Cunningham identifies prospective jurors Nos. 10, 11, 14, 22, 38, and 76 as exhibiting an inability to consider mitigating factors and life-sentencing options and claims that the trial court precluded defense counsel's attempts to question them on this issue. Only prospective jurors Nos. 11, 14, and 38 ultimately sat on the jury, and Cunningham has failed to demonstrate that these jurors were not fair and impartial. See, e.g., *Broom*, 40 Ohio St.3d at 287-288, 533 N.E.2d 682 (any claim that a jury was not impartial is focused on those jurors who ultimately sat).

**{¶ 26}** During individual voir dire, prospective jurors Nos. 11, 14, and 38 stated that they would follow the court's instructions and would not automatically vote for the death penalty. Each juror agreed to fairly consider mitigating factors and all sentencing options before making any sentencing determination.

**{¶ 27}** Moreover, contrary to Cunningham's assertions, the trial court allowed defense counsel a meaningful opportunity to question these jurors regarding their views on capital punishment. For example, defense counsel explained the four sentencing options to prospective juror No. 11 and asked whether she would automatically vote for the death sentence. When she responded "no," defense counsel asked her to explain her views. Counsel then informed prospective juror No. 11 that the defendant had the right to present mitigating evidence, defined mitigating factors as "reasons why not to impose death," and asked whether she would consider those mitigating factors "when [she considers] the four (4) [sentencing] options available to [her]?" The trial court permitted defense counsel to pose similar questions to prospective jurors Nos. 14 and 38.

**{¶ 28}** The record does not support Cunningham's claim that the trial court unreasonably restricted defense counsel's examination of prospective jurors. See, e.g., *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913.

8

Cunningham has not shown that jurors were unwilling to fairly consider mitigating evidence or life-sentencing options. We reject proposition of law IV.

### *Pretrial Publicity*

{¶ 29} In proposition of law V, Cunningham contends that the trial court's denial of his motion to change venue deprived him of a fair and impartial jury and due process. Cunningham argues that pretrial publicity was so pervasive that prejudice must be presumed.

{¶ 30} Courts rarely presume that a jury is prejudiced by pretrial publicity. See *Lundgren,* 73 Ohio St.3d at 479, 653 N.E.2d 304. That prospective jurors have been exposed to pretrial publicity does not necessarily demonstrate prejudice requiring a change of venue. See *State v. White* (1998), 82 Ohio St.3d 16, 21, 693 N.E.2d 772; *State v. Landrum* (1990), 53 Ohio St.3d 107, 116-117, 559 N.E.2d 710. See, also, *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 ("pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial").

{¶ 31} A motion for change of venue is governed by Crim.R. 18(B), which provides that a trial court may change venue "when it appears that a fair and impartial trial cannot be held" in that court. See, also, R.C. 2901.12(K). " '[A] careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " *Landrum,* 53 Ohio St.3d at 117, 559 N.E.2d 710, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. If the record on voir dire establishes that prospective jurors have been exposed to pretrial publicity but would nevertheless determine defendant's guilt or innocence solely on the law and evidence presented at trial, it is not error for the trial court to empanel those jurors. *State v. Maurer* (1984), 15 Ohio St.3d 239, 252, 15 OBR 379, 473 N.E.2d 768; *State v. Carter* (1995), 72 Ohio St.3d 545, 556, 651 N.E.2d 965.

**{¶ 32}** Here, the trial court conducted an extensive voir dire that covered four days and nearly 900 pages of transcript. After a thorough general voir dire with counsel for both sides participating, the trial court conducted a sequestered voir dire during which prospective jurors were individually questioned regarding the death penalty and exposure to pretrial publicity. The trial court and counsel asked prospective jurors whether they had been exposed to pretrial media coverage, the extent of their exposure, and whether they had obtained any knowledge about the case from other sources. Most prospective jurors acknowledged hearing something about the case through local media coverage or from other sources within the community. Nevertheless, most prospective jurors accepted the presumption of innocence, stated that they had not formed an opinion about Cunningham's guilt, and asserted that they could put aside any exposure to pretrial publicity and decide the case solely on the evidence at trial. The trial court readily excused members of the venire who had formed fixed opinions or were otherwise unsuitable.

**{¶ 33}** Cunningham's claim of pervasive publicity is undercut by the fact that he did not challenge on pretrial publicity grounds any of the jurors actually seated. Further, he failed to exhaust all of his peremptory challenges. Counsel's failure to challenge jurors and to exhaust peremptory challenges indicates that the defense was satisfied that the final jury was not prejudicially affected by pretrial publicity. See, e.g., *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 37. Cunningham has failed to show that "the publicity in this case was so pervasive that it impaired the ability of the empaneled jurors to deliberate fairly and impartially." *State v. Treesh* (2001), 90 Ohio St.3d 460, 463-464, 739 N.E.2d 749. We reject proposition of law V.

## GUILT-PHASE ISSUES

### *Examination of Witness Statements*

{¶ 34} In proposition of law I, Cunningham claims that the trial court did not permit defense counsel to review the pretrial statements of prosecution witnesses for inconsistencies as required by Crim.R. 16(B)(1)(g). Cunningham contends that by not allowing the defense to participate in the inspection of the witnesses' statements, the trial court committed reversible error per se and violated his rights of confrontation and due process.

{¶ 35} Crim.R. 16(B)(1)(g) provides:

{¶ 36} "In camera inspection of witness' statement. Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.

{¶ 37} "If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.

{¶ 38} "If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.

{¶ 39} "Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal."

{¶ 40} During the state's case, Cunningham's trial counsel made Crim.R. 16(B)(1)(g) motions with regard to six prosecution witnesses. The trial court determined that inconsistencies existed between the pretrial statements and trial testimony of Tara Cunningham, Shane Liles, and James Grant and provided their statements to defense counsel for cross-examination. The trial court found no inconsistencies between the pretrial statements and testimony of Dwight Goodloe,

Coron Liles, and Tomeaka Grant and did not provide their statements to the defense. The trial court preserved all statements for appellate review.

{¶ 41} The initial question we must resolve is whether any of the witness statements are "statements" subject to disclosure pursuant to Crim.R. 16(B)(1)(g). The statements at issue are contained in incident reports compiled by the Lima Police Department during its investigation of the shootings. In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, we considered whether police reports constitute statements discoverable under Crim.R. 16(B)(1)(g). We ruled that those portions of police reports recording the officer's personal observations and recollections of the events are subject to scrutiny under Crim.R. 16(B)(1)(g), stating:

{¶ 42} "Clearly, a signed written statement of a state witness would serve the purpose of Crim.R. 16(B)(1)(g) and fall within the plain meaning of the word 'statement,' just as would a recording of the witness' words or a transcription thereof. We see no reason why the mere fact that the document was a report of a police officer would automatically bar its disclosure." Id. at 225, 15 OBR 311, 473 N.E.2d 264.

{¶ 43} In *Jenkins*, we specifically excluded from discovery other portions of a police officer's report, including statements from other witnesses contained therein. "This is not to say that all portions of a police report are discoverable under Crim.R. 16(B)(1)(g). Reading this section in pari materia with Crim.R. 16(B)(2), it becomes apparent that those portions of a testifying police officer's signed report concerning his observations and recollection of the events are 'statements' within the meaning of Crim.R. 16(B)(1)(g). Those portions which recite matters beyond the witness' personal observations, *such as notes regarding another witness' statement* or the officer's investigative decisions, interpretations and interpolations, are privileged and excluded from discovery under Crim.R.

12

16(B)(2). Cf. *State v. Houston* (Iowa 1973), 209 N.W.2d 42, 46." (Emphasis added.) *Jenkins,15 Ohio St.3d* at 225, 15 OBR 311, 473 N.E.2d 264.

{¶ 44} Here, the trial court failed to make an independent, threshold determination whether a "producible out-of-court witness statement" exists within the meaning of Crim.R. 16(B)(1)(g). *State v. Daniels* (1982), 1 Ohio St.3d 69, 1 OBR 109, 437 N.E.2d 1186, syllabus; *State v. Jenkins,* 15 Ohio St.3d at 225-226, 15 OBR 311, 473 N.E.2d 264. Unlike the situation in *Jenkins,* the testifying witnesses in this matter were not the officers who wrote the police reports. Instead, the testifying witnesses were victims of the shootings, and their pretrial "statements" are actually the police officers' written summaries of what the victims had allegedly told the officers. Nothing in the record indicates that these witnesses had reviewed, signed, adopted, or otherwise approved the material in the police reports as their own statements. There is no proof that the police officers' summaries are an accurate reproduction of the witnesses' own words. Therefore, we find that these pretrial statements are not statements subject to an in camera inspection under Crim.R. 16(B)(1)(g).

{¶ 45} Even if we assume, as the trial court did, that the witnesses made statements for purposes of Crim.R. 16, reversible error did not occur. In *State v. Daniels,* 1 Ohio St.3d 69, 1 OBR 109, 437 N.E.2d 1186, we interpreted the "present and participating" provision in Crim.R. 16(B)(1)(g) as requiring, upon the granting of a defendant's timely motion for an in camera inspection, that attorneys for all parties be given the opportunity to "(1) inspect the statement personally; and (2) call to the court's attention any perceived inconsistencies between the testimony of the witness and the prior statement. (Crim.R. 16[B][1][g], construed and applied.)" Id. at syllabus.

{¶ 46} Cunningham interprets *Daniels* as requiring reversal of a defendant's conviction any time the trial court prevents counsel from participating in the in camera inspection, regardless of whether prejudice has occurred. On its

face, we concede that *Daniels* arguably could be read as establishing a per se rule of prejudicial error. In *Daniels,* we stated that the trial court's failure to afford defense counsel the opportunity to inspect the witness's statement personally and call to the court's attention any perceived inconsistencies constituted reversible error per se. Id. at 71, 1 OBR 109, 437 N.E.2d 1186. Nevertheless, a closer reading of our decision in *Daniels* indicates that more than counsel's exclusion from the in camera inspection is required to give rise to reversible error.

{¶ 47} The scope of our finding of prejudicial error per se in *Daniels* is clearly limited by the language "under the facts at bar." Id. In *Daniels*, we reviewed the pretrial statement and in-court testimony at issue and found that inconsistencies existed between the two. Id., fn. 3. Had we intended to set forth a per se prejudicial-error rule, our review and finding would not have been necessary. The conclusion that we did not establish a per se prejudicial-error rule in *Daniels* comports with the last section of Crim.R. 16(B)(1)(g), which requires the trial court to preserve the statement for appellate review if any part of the witness statement is not given to defense counsel.

{¶ 48} Cunningham has waived all but plain error in regard to this issue. Crim.R. 52(B); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. There was no plain error. Defense counsel and the prosecutor were present while the trial court reviewed the statements. Although the transcript is not entirely clear, it appears that defense counsel did not personally inspect the statements as permitted by Crim.R. 16(B)(1)(g). Nevertheless, once the trial court concluded that there were no inconsistencies between the statements and trial testimony of Goodloe, Coron Liles, and Tomeaka Grant, defense counsel did not ask to review the statements or object to the procedure employed by the court in examining the statements. Defense counsel merely accepted the trial court's decision that there were no inconsistencies and asked that the statements be preserved for appellate review. Under somewhat

14

similar circumstances in *Jenkins*, we said that "a defendant cannot be heard to complain on appeal about a matter which the trial judge could have remedied if the defense had complained then." *Jenkins,* 15 Ohio St.3d at 226, 15 OBR 311, 473 N.E.2d 264.

{¶ 49} Cunningham has failed to identify any inconsistencies that would warrant reversal. Cf. *State v. White* (1968), 15 Ohio St.2d 146, 44 O.O.2d 132, 239 N.E.2d 65. On appeal, Cunningham does not argue that any inconsistencies exist between the pretrial statements and testimony of Coron Liles and Tomeaka Grant. Cunningham does argue that Goodloe's police statement and trial testimony are inconsistent because his statement lacked many of the details to which he later testified. The fact that details may be lacking in a pretrial statement does not mean that inconsistencies exist for purposes of Crim.R. 16(B)(1)(g). This observation would be particularly true where, as here, the accuracy of Goodloe's statement to police cannot be established.

{¶ 50} Finally, Cunningham cannot establish prejudice, because Goodloe's testimony was merely cumulative of other evidence establishing Cunningham's guilt. Had defense counsel been able to use Goodloe's pretrial statement on cross-examination to rebut his direct testimony, the outcome of the trial would not have been altered in light of the testimony from the other surviving witnesses. We reject proposition of law I.

### *Jury Instructions*

{¶ 51} Cunningham argues in proposition of law II that the trial court instructed the jury in a manner calculated to defeat the effectiveness of cross-examination. Cunningham complains that the court instructed the jury that inconsistencies in testimony did not affect witness credibility.

{¶ 52} During the guilt phase, the trial court instructed the jury regarding the credibility of witnesses and the weight to be given their testimony. The court's instruction substantially tracked the standard credibility instruction in 4

Ohio Jury Instructions (2001), Section 405.20. The trial court, however, added the following language to the general charge:

{¶ 53} "You should not decide any issue of fact merely on the basis of the number of witnesses who testify on each side of the issue. Rather, the final test in judging evidence should be the force and weight of the evidence, regardless of the number of witnesses on each side of an issue. The testimony of one witness, believed by you, is sufficient to prove any fact.

{¶ 54} "Also, discrepancies in the witness' testimony, or between his or her testimony and that of others, if there are any, does not necessarily mean that you should disbelieve that witness, as people commonly forget facts or recollect them erroneously after the passage of time. In considering a discrepancy in a witness [sic] testimony, you should consider whether such discrepancy concerns an important fact or a trivial fact."

{¶ 55} The trial court gave an identical preliminary instruction to the jury before trial.

{¶ 56} Cunningham failed to object to this instruction and thus waived all but plain error. An erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus, following *State v. Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

{¶ 57} There was no error, plain or otherwise, in the trial court's credibility instruction. Crim.R. 30(B) permits the trial court to give the jury instructions of law relating to credibility and weight of the evidence. A single jury instruction may not be judged in artificial isolation but must be viewed in the context of the overall charge. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. When the credibility instruction is viewed in its entirety, it is clear that the trial court did not instruct

the jury to disregard discrepancies in the evidence. Rather, the court charged the jury to consider discrepancies and weigh their significance when determining credibility.

{¶ 58} Even were we to find error in the trial court's credibility instruction, plain error is lacking. Cunningham contends that this instruction significantly damaged his defense, which was presented primarily through cross-examination of the state's witnesses. Defense counsel sought to establish that Cunningham did not plan to rob or kill anyone that night, that he fired no shots, and that he did not participate in the robbery. The state's case against Cunningham rested primarily on the testimony of several eyewitnesses, and their testimony was consistent regarding Cunningham's degree of participation in the crimes. All but one of the surviving eyewitnesses identified Cunningham as one of the two assailants who held them at gunpoint while they were forced to surrender their valuables. Several witnesses testified that Cunningham fired his weapon into the group. Despite Cunningham's claims to the contrary, the eyewitness testimony of the state's witnesses was strongly corroborated. Cunningham has therefore failed to show that, but for the trial court's credibility instruction, the result of his trial would have been different.

{¶ 59} Cunningham also argues that the effect of this guilt-phase instruction had a carryover effect on the penalty phase. We disagree. As discussed, there was no error in the trial court's credibility instruction. Moreover, the instruction was not repeated in the penalty phase. We reject proposition of law II.

### *Photographic Evidence*

{¶ 60} In proposition of law VI, Cunningham contends that the trial court erred by admitting irrelevant, repetitive, and inflammatory photographs of the victims. In capital cases, relevant, nonrepetitive photographs are admissible, even if gruesome, as long as the probative value of each photograph outweighs the

danger of material prejudice to the accused. *State v. Maurer,* 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267. Decisions on the admissibility of photographs are left to the sound discretion of the trial court. *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 61} Many of the photographs that Cunningham complains of on appeal were not objected to at trial. Cunningham's claim that objections were raised at trial to exhibits 38, 44, 50, 53, 56, 57, 58, and 60 is not supported by the record. Thus, Cunningham has waived all but plain error as to exhibits 38, 39, 44, 45, 47, 48, 49, 50, 53, 56, 57, 58, and 60. *State v. Twyford* (2002), 94 Ohio St.3d 340, 358, 763 N.E.2d 122. These photos illustrated the testimony of police officers and eyewitnesses who described the crime scene and were probative of intent and the nature and circumstances of the crime. See, e.g., *State v. Hughbanks,* 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 72; *State v. Reynolds* (1998), 80 Ohio St.3d 670, 676-677, 687 N.E.2d 1358. We conclude that outcome-determinative plain error did not result from the admission of any of these photographs.

{¶ 62} As to those exhibits objected to at trial, Cunningham has not shown that the trial court erred in admitting these photographs. Cunningham raises issues regarding four autopsy photos (exhibits 34, 35, 36, and 37), two photos depicting injuries sustained by surviving witnesses (exhibits 40 and 41), and two crime-scene photos depicting Leneshia's body (exhibits 42 and 43).

{¶ 63} Exhibits 34, 35, 36, and 37 are autopsy photographs of Leneshia and depict gunshot wounds to her head. Exhibit 34 depicts a gunshot wound to the back of her head. Exhibit 35 is a picture of the same wound taken from a wider angle. Exhibits 34 and 35 are repetitive, and we find that only one of these photos should have been admitted. Similarly, exhibit 36 is merely a close-up version of exhibit 37, and only one of these photos should have been admitted.

Nevertheless, these photos illustrated the coroner's testimony and were highly relevant to intent and cause of death. Despite the repetitive nature of exhibits 35 and 37, we conclude that Cunningham was not materially prejudiced by their admission. See, e.g., *State v. Campbell* (1994), 69 Ohio St.3d 38, 50, 630 N.E.2d 339; *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 96-97.

{¶ 64} Exhibits 40 and 41 are photos of Tomeaka Grant taken while she was in the hospital recovering from her injuries. Exhibit 40 depicts a gunshot wound to her face. Exhibit 41 is a photo of her face from a different angle and illustrates an injury to her left eye. Neither photo is so gruesome as to pose a risk of material prejudice. Both are relevant to show the injuries this victim sustained and are probative of Cunningham's intent.

{¶ 65} Exhibit 42 is a crime-scene photo of Leneshia lying in a pool of blood. This photo depicts how the body was positioned in the home and, although gruesome, it is probative of intent and the manner and circumstances of her death. The probative value outweighed any danger of unfair prejudice. See, e.g., *State v. Biros* (1997), 78 Ohio St.3d 426, 444-445, 678 N.E.2d 891. Cunningham complains about exhibit 43 but offers no argument on appeal explaining why he believes this exhibit was admitted in error. Exhibit 43 shows Leneshia's hand in a pool of blood. This photo is gruesome, but it helped explain the testimony of police officers who discovered and processed the crime scene. It is not duplicative or cumulative, and no abuse of discretion occurred, since the value of this photo outweighed any prejudicial impact.

{¶ 66} Cunningham also complains that the trial court erred in readmitting certain photos during the penalty phase. At that stage, the defense objected to exhibits 38, 39, and 40. A trial court may properly allow repetition of much or all that occurred in the guilt phase pursuant to R.C. 2929.03(D)(1). *State v. DePew* (1988)*,* 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542; *State v. Woodard* (1993),

68 Ohio St.3d 70, 78, 623 N.E.2d 75.  Thus, there was no error.  We reject proposition of law VI.

## SENTENCING ISSUES

### *Penalty-Phase Jury Instructions*

{¶ 67} Cunningham claims in proposition VII that the trial court erred when it failed to instruct the jury about which evidence from the guilt phase was relevant and could be considered during the penalty phase.  Cunningham argues that the trial court erred by instructing the jury:

{¶ 68} "For purposes of this proceeding, only that evidence admitted in the trial phase that is relevant to the aggravating circumstance and to any mitigating factors is to be considered by you."

{¶ 69} Cunningham failed to object to the above instruction.  He also failed to object when the trial court granted the state's request to admit all testimony from the guilt phase in the penalty phase.  Thus, Cunningham has waived all but plain error.  Crim.R. 52(B).  We conclude that plain error did not occur.

{¶ 70} In *State v. Coley* (2001), 93 Ohio St.3d 253, 269-270, 754 N.E.2d 1129, we rejected the same argument that Cunningham now makes.  In this case, as in *Coley,* the trial court determined which guilt-phase exhibits were relevant to the penalty phase and instructed the jury that "only that testimony and evidence which was presented in this [first] phase that is relevant to the two aggravating circumstances * * * and to any of the mitigation factors * * * are to be considered by you."  Id. at 269, 754 N.E.2d 1129.  Here, the trial court identified a single aggravating circumstance for the jury's consideration and instructed the jury that only this aggravating circumstance may be considered and the "aggravated murder itself is not an aggravated [sic] circumstance."

{¶ 71} Much of the guilt-phase testimony was relevant in the penalty phase because it related to the course-of-conduct aggravating circumstance, as

20

well as to the nature and circumstances of the offenses. See *State v. Jones,* 91 Ohio St.3d at 350, 744 N.E.2d 1163; *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 111. We reject proposition of law VII.

### Trial Court Sentencing Opinion

**{¶ 72}** Cunningham argues in proposition of law X that the trial court's sentencing opinion is inadequate and does not comply with the requirements of R.C. 2929.03(F). Cunningham claims that the trial court made an incorrect finding of fact, failed to consider relevant mitigating evidence, and improperly conducted its weighing process.

**{¶ 73}** R.C. 2929.03(F) requires the trial court, in imposing a sentence of death, to state in a separate opinion "its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances * * * were sufficient to outweigh the mitigating factors."

**{¶ 74}** Cunningham contends that the trial court made an incorrect finding of fact when it stated in its sentencing opinion that Goodloe had testified that Cunningham had shot him. Cunningham is correct that Goodloe gave no such testimony. Goodloe, however, did testify that he saw Cunningham shoot Coron Liles in the mouth. Thus, Cunningham was not prejudiced, and this error was harmless.

**{¶ 75}** Cunningham next argues that the trial court failed to consider relevant mitigating evidence because the sentencing opinion did not refer to some of his most compelling mitigating evidence. He also contends that the trial court erred in assigning little or no weight to those factors it did consider.

**{¶ 76}** Although "a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips* (1995), 74 Ohio St.3d 72, 102, 656 N.E.2d 643. "The fact that mitigation evidence is

admissible 'does not automatically mean that it must be given any weight.' *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus." *State v. Mitts* (1998), 81 Ohio St.3d 223, 235, 690 N.E.2d 522. In imposing sentence, the assessment of and weight given to mitigating evidence are matters within the trial court's discretion. *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293. Even when a trial court assigns no value in mitigation, the weight to assign a given factor is a matter for the discretion of the individual decisionmaker. See *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124. The trial court did not commit error.

{¶ 77} The trial court did err, however, in failing to specify that it separately considered the death sentence for each aggravated murder. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. Our independent review of the death sentence cures any error in this regard. See *Fox*, 69 Ohio St.3d at 191-192, 631 N.E.2d 124; *State v. Jackson* (2001), 92 Ohio St.3d 436, 450, 751 N.E.2d 946. Cf. State v. *Green (2000),* 90 Ohio St.3d 352 360-364, 738 N.E.2d 1208. We reject proposition of law X.

## PROSECUTORIAL MISCONDUCT

{¶ 78} In proposition of law VIII, Cunningham argues that he was denied a fair trial because of prosecutorial misconduct. Whether the prosecutor's remarks at trial constitute misconduct requires analysis as to (1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14-15, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 79} Cunningham argues that prosecutorial misconduct occurred when the prosecutor improperly introduced victim-impact evidence through the testimony of Armetta Robinson. Defense counsel failed to object, however, and

waived all but plain error. *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 160-161, 749 N.E.2d 226.

{¶ 80} Robinson, a victim of the shooting, testified that she had no recollection of the day she was shot. She displayed the gunshot wound on the back of her head, told the jury that she had had surgery, that she had been in a coma for 47 days, and that she was undergoing occupational, physical, and speech therapy. She also identified her eyeglasses, which later testimony confirmed had been found at the scene of the crime.

{¶ 81} Cunningham was charged with the attempted murder of Robinson, and, although she could not identify Cunningham as her assailant, her testimony was relevant to issues of his intent and to show the nature and extent of her injuries. See *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (victim-impact evidence relating to the facts attendant to the offense is clearly admissible during the guilt phase). Robinson's identification of her eyeglasses helped to prove that she had been at Shane's apartment at the time of the shooting. Testimony about her gunshot wound proved that she had been shot, and her testimony about surgery, her coma, and her physical therapy established that she had been seriously injured. Finally, her testimony was not directed to the penalty and did not appear to be overly emotional. It cannot be said that the outcome of Cunningham's trial would have been otherwise but for Robinson's testimony. Its admission was not error. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 293, 754 N.E.2d 1150. See, also, *Reynolds,* 80 Ohio St.3d at 679, 687 N.E.2d 1358.

{¶ 82} Cunningham claims that the prosecutor made several improper comments during guilt-phase closing argument. During the defense's closing argument, counsel argued that the physical evidence found at the scene proved that only one weapon was fired and that Jackson fired that weapon. Defense counsel suggested that Cunningham's gun was inoperable. Cunningham complains that the prosecutor responded to this argument by improperly

speculating about evidence when he commented about the condition of bullets purportedly fired from Cunningham's gun and how the age of a gun affects its use. Cunningham's failure to object to these comments waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916.

{¶ 83} "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom." *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 595 N.E.2d 915. See, also, *Watson,* 61 Ohio St.3d at 10, 572 N.E.2d 97. The prosecutor's comment about the condition and operability of Cunningham's gun was not misconduct. During cross-examination, defense counsel elicited from James Grant that he had seen Cunningham holding a revolver that had not been well cared for and "looked old and rusty." Thus, the prosecutor's comment about the gun amounted to fair comment on the evidence. See, e.g., *State v. Hicks* (1989), 43 Ohio St.3d 72, 76-77, 538 N.E.2d 1030.

{¶ 84} The prosecutor's comment about bullets being lost or damaged was also not misconduct. In *Richey,* laboratory tests failed to reveal fire accelerants on defendant's clothing. Nevertheless, we found that the prosecutor's comments speculating why accelerants had not been found in an arson case amounted to fair comment. *Richey,* 64 Ohio St.3d at 362, 595 N.E.2d 915.

{¶ 85} Cunningham complains that the prosecutor made inflammatory comments about one of the victims and improperly commented on Cunningham's right to a fair trial. During the state's rebuttal closing argument, the prosecutor stated that "[Jayla Grant] never asked to be there and she was never given a chance. She was never given justice like he's receiving." Cunningham argues that the prosecutor's comment invited the jury to punish Cunningham for exercising his jury trial rights and insinuated that the only way for the victim to receive justice was through Cunningham's conviction. Cunningham did not object to the comment and waived all but plain error.

{¶ 86} Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. See *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068. The "justice" comment was within the creative latitude accorded both parties in closing argument. See, e.g., *State v. Nields* (2001), 93 Ohio St.3d 6, 38, 752 N.E.2d 859. The comment that Jayla Grant "was never given a chance" represented fair commentary on the evidence because Cunningham had rejected numerous pleas to spare her life. See *State v. Clemons* (1998), 82 Ohio St.3d 438, 452, 696 N.E.2d 1009.

{¶ 87} Similarly, the prosecutor's comment characterizing the murders as "the most cold-blooded calculated inhumane murder" fell within the latitude permitted to both parties. See *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523. See, also, e.g., *State v. Grant* (1993), 67 Ohio St.3d 465, 484, 620 N.E.2d 50; *State v. Greer* (1988), 39 Ohio St.3d 236, 251, 530 N.E.2d 382. Even if these comments were improper, nothing suggests that but for these comments, the outcome of Cunningham's trial would have been otherwise. See *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 658 N.E.2d 754.

{¶ 88} Cunningham also claims that prosecutorial misconduct occurred during the penalty phase. He first contends that the prosecutor improperly commented that his unsworn statement prevented cross-examination. We reject this argument. See *State v. Smith* (2000), 87 Ohio St.3d 424, 444, 721 N.E.2d 93; *State v. Davis* (1996), 76 Ohio St.3d 107, 119-120, 666 N.E.2d 1099.

{¶ 89} Cunningham contends that the prosecutor mischaracterized the mitigating evidence throughout closing argument by advising the jury to weigh evidence other than the mitigation evidence presented by the defense. As a result, Cunningham argues, the prosecutor improperly injected nonstatutory aggravating circumstances into the penalty-phase weighing process. Cunningham failed to

object, however, and waived all but plain error. *Slagle,* 65 Ohio St.3d at 604, 605 N.E.2d 916.

{¶ 90} Here, each of the comments complained of related to evidence presented during the penalty phase. Prosecutors are entitled to urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight. *Wilson,* 74 Ohio St.3d at 399, 659 N.E.2d 292. Although some comments could have been more artfully stated, the prosecutor never argued nonstatutory aggravating circumstances to the jury or urged the jury to weigh mitigating evidence as aggravating. Moreover, the trial court correctly instructed the jury on the aggravating circumstance and on the proper standard to apply in the weighing process. See *Smith,* 87 Ohio St.3d at 444, 721 N.E.2d 93. It is presumed that the jury followed the court's instructions. *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082. Accordingly, we find no plain error.

{¶ 91} Finally, Cunningham contends that the cumulative effect of misconduct impaired the overall fairness of his trial. This argument is without merit. See, e.g., *Landrum,* 53 Ohio St.3d at 113, 559 N.E.2d 710; *Smith,* 87 Ohio St.3d at 444-445, 721 N.E.2d 93. We reject proposition of law VIII.

## INEFFECTIVE ASSISTANCE OF COUNSEL

{¶ 92} In proposition of law IX, Cunningham makes various claims of ineffective assistance of counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires that the defendant show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 93} *Inadequate voir dire.* Cunningham claims that counsel failed to adequately question prospective jurors regarding their exposure to a billboard erected in Lima after the shootings. The billboard was part of a community action campaign designed to fight violence and was erected in response to the shootings

in this case and an unrelated firebombing in Lima. The billboard displayed a picture of Jayla Grant, Leneshia Williams's name, and the names of four children killed in a firebombing, and included the words "Stop the Violence."

{¶ 94} Cunningham's trial counsel asked two potential jurors about the billboard, and one juror had seen it. Juror No. 13, who sat on Cunningham's jury, saw the billboard but said that she had not formed any opinion about Cunningham's guilt or innocence because of the billboard. Cunningham argues that after discovering that one juror had seen the billboard, his trial counsel should have questioned the other potential jurors to determine whether they had seen the billboard and, if so, whether they were prejudicially affected.

{¶ 95} Trial counsel, who saw and heard the jurors, were in the best position to determine the extent to which prospective jurors should be questioned. *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765; *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, at ¶ 108. As discussed in proposition of law V, both counsel and the trial court thoroughly questioned potential jurors regarding their exposure to pretrial publicity. Those jurors who had formed fixed opinions about the case were excused. Trial counsel's failure to ask other jurors about the billboard did not reflect deficient performance.

{¶ 96} *Failure to support change of venue.* Cunningham claims that counsel were ineffective by failing to adequately support the motion for change of venue. In the motion, counsel represented that they would produce evidence in support of their request to change venue should the trial court decide to hold an evidentiary hearing. Cunningham concedes that the trial court never held an evidentiary hearing but nevertheless contends that counsel were ineffective for failing to proffer newspaper clippings to support the motion.

{¶ 97} Cunningham has not shown that trial counsel's failure in this regard deprived him of a fair trial. The trial court was well aware of the extent of media coverage and pretrial publicity because most prospective jurors

acknowledged during voir dire that they had heard something about the case. The trial court and counsel thoroughly questioned prospective jurors regarding their exposure to pretrial publicity, and the trial court readily excused potential jurors who could not be fair and impartial. It is not clear how defense counsel's failure to submit newspaper clippings about the case would have affected the trial court's decision to deny a change of venue. Therefore, no basis exists to find deficient performance or prejudice. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus, following *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 98} *Failure to object to photographic evidence.* Cunningham contends that counsel performed ineffectively when they failed to object to irrelevant, repetitive, and cumulative photographs. As discussed in proposition VI, all of these photographs were relevant, probative of disputed issues, and nonprejudicial. Thus, the photographs were properly admitted, and counsel's failure to object did not affect the outcome of Cunningham's trial. See, e.g., *State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, at ¶ 159. For the same reasons, we reject Cunningham's claim regarding counsel's failure to object to the admission of exhibits during the mitigation phase.

{¶ 99} *Failure to object to Crim.R. 16(B)(1)(g) inspection.* Cunningham alleges that trial counsel were ineffective for failing to object to the procedure employed by the trial court in conducting its Crim.R. 16(B)(1)(g) inspection of witness statements. Counsel should have objected to the manner in which the trial court conducted the in camera inspections and asked to personally review the witnesses' pretrial statements. See proposition of law I. Nevertheless, Cunningham has not established prejudice, i.e., a reasonable probability that the result of his trial would have been different if an objection had been raised and counsel had been allowed to participate in the inspections. See *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

28

**{¶ 100}** *Ineffective penalty-phase closing argument.* Cunningham argues that counsel's penalty-phase closing argument was too brief and that counsel failed to argue relevant and humanizing defense mitigation testimony. Cunningham further contends that counsel should have made a more "powerful plea" to spare Cunningham's life. We rejected a similar argument in *State v. Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d 373, finding that it is "nearly impossible for a reviewing court to discern the amount of emotion or feeling the argument showed."

**{¶ 101}** Moreover, judicial scrutiny of counsel's performance must be highly deferential, and reviewing courts should refrain from second-guessing tactical decisions of trial counsel. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. During closing argument, Cunningham's counsel set forth the four sentencing options, outlined the mitigating factors established by the evidence, and asked the jury to consider those factors in making a determination. Counsel also informed jurors that they did not have to unanimously agree on the existence of mitigating factors before considering them against the aggravating circumstance, that any one mitigating factor is sufficient to support a life sentence, and emphasized that one juror alone could prevent the death penalty. Counsel also argued that Cunningham had accepted responsibility for his actions and shown remorse. Whether defense counsel should have spoken more forcefully in urging a life sentence is a tactical question, and Cunningham has failed to establish that counsel's performance fell below an objective standard of reasonable representation. See *State v. Ballew* (1996), 76 Ohio St.3d 244, 256-257, 667 N.E.2d 369.

**{¶ 102}** *Failure to object to prosecutorial misconduct.* Cunningham also claims deficient performance in trial counsel's failure to object to various instances of prosecutorial misconduct. As mentioned in our discussion of proposition of law VIII, none of the alleged instances of prosecutorial misconduct

prejudicially affected Cunningham's substantive rights.  Therefore, trial counsel were not ineffective for failing to object to the prosecutor's allegedly improper comments.

{¶ 103}  *Failure to object to instructions.*  Cunningham claims that counsel were ineffective in failing to object to the trial court's jury instructions on witness credibility and reasonable doubt.  In propositions of law II and XII, however, we concluded that those instructions were not erroneous.  Consequently, counsel were not ineffective for failing to object.

{¶ 104}  *Failure to present mitigation evidence.*  Cunningham claims that counsel were ineffective during the penalty phase of his trial because they failed to present certain mitigation evidence and argue that his lesser role in the offenses was a mitigating factor under R.C. 2929.04(B)(6).  Cunningham contends that trial counsel should have attempted to introduce Cunningham's pretrial statement to police in which he asserted that his weapon was inoperable and, as a result, he did not fire any shots in Shane Liles's apartment.  For the following reasons, we conclude that defense counsel were not ineffective for failing to offer Cunningham's pretrial statement as mitigating evidence.

{¶ 105}  Cunningham's pretrial statement is hearsay and does not fall within any exception to the hearsay rule.  Although Cunningham's statement is that of a party opponent, Evid.R. 801(D)(2) by its terms applies only to statements offered *against* a party.  See *In re Coy* (1993), 67 Ohio St.3d 215, 217-218, 616 N.E.2d 1105.  A party may not introduce his own statement under Evid.R. 801(D)(2)(a).  Id., citing Staff Note to Evid.R. 801(D)(2).  Thus, Cunningham's trial counsel cannot be deemed ineffective for failing to introduce an inadmissible statement.

{¶ 106}  Cunningham has not established that he was prejudiced by counsel's failure to offer his statement into evidence during the penalty phase.  Cunningham's argument that his pretrial statement, if offered and admitted, would

have altered the jury's recommendation of death is purely speculative. Cunningham claims that physical evidence found at the scene corroborates his claim that he never fired his gun. Several eyewitnesses who testified at trial, however, contradicted this evidence. Thus, Cunningham has not shown that there was a reasonable probability that his sentence would have been different had his pretrial statement been introduced. *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph three of the syllabus.

**{¶ 107}** R.C. 2929.04(B)(6) provides that, if the defendant was a participant in the offense but not the principal offender, "the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim" are to be considered and weighed against the aggravating circumstances. Cunningham's guilt was by complicity and not as a principal offender. Nevertheless, defense counsel could have reasonably concluded, in light of Cunningham's significant involvement in the planning and execution of the crimes, that the R.C. 2929.04(B)(6) factor was worth little, if any, weight in mitigation. Judicial scrutiny of counsel's performance must be highly deferential, and strategic decisions made after thorough investigation of plausible options are virtually unchallengeable. *Strickland,* 466 U.S. at 689-690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 108}** Cunningham has not established prejudice arising from counsel's decision not to argue the R.C. 2929.04(B)(6) mitigating factor. See *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, at paragraph two of the syllabus. During the penalty phase, the jury was well aware of evidence from the guilt phase regarding Cunningham's status as a nonprincipal offender and his role in the offenses. The trial court instructed the jury that it was not limited to specific mitigating factors and "should consider any other mitigating factors that weigh in favor of a sentence other than death." Counsel were not ineffective for failing to

argue Cunningham's lesser role in the murders as an R.C. 2929.04(B)(6) mitigating factor.

{¶ 109} *Supplemental ineffective-counsel claims.* Cunningham submitted a supplemental brief to proposition of law IX claiming that counsel failed to adequately question potential jurors regarding information contained in their juror questionnaires. Cunningham claims that defense counsel were ineffective in failing to ask juror No. 21 whether her job as a crisis counselor for crime victims would affect her ability to be fair or cause her sympathy for the victims to overwhelm her judgment. Contrary to Cunningham's claim, defense counsel asked juror No. 21 whether her position at children's services, and the fact that a three-year-old child had been killed, would affect her ability to be fair and impartial. Juror No. 21 indicated that her job would not cause her to be biased against Cunningham.

{¶ 110} Cunningham also complains that juror No. 37 expressed an automatic pro-death-penalty stance in her questionnaire but that counsel failed to ask any questions to determine whether this juror would in fact automatically vote for the death penalty. This allegation is not true. Defense counsel asked juror No. 37 whether she would automatically vote for the death penalty if Cunningham were found guilty. Defense counsel also asked whether she would consider mitigating factors even if they conflicted with her own beliefs. Juror No. 37 stated that she would follow the court's instructions and consider mitigating factors.

{¶ 111} We reject proposition of law IX.

### CONSTITUTIONALITY/SETTLED ISSUES

*Residual Doubt*

{¶ 112} In proposition of law XI, Cunningham requests that we reconsider our decision in *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, and give weight to residual doubt as a mitigating factor when

conducting our independent review of his death sentence. We decline to do so. See *Green,* 90 Ohio St.3d at 360, 738 N.E.2d 1208. Accordingly, proposition of law XI is denied.

### *Reasonable Doubt*

{¶ 113} Cunningham challenges the trial court's instruction on reasonable doubt, which was in accord with R.C. 2901.05(D). We have previously rejected complaints against the statutory definition. See, e.g., *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604; *Getsy,* 84 Ohio St.3d at 202, 702 N.E.2d 866. The reasonable-doubt instruction given in the sentencing phase was consistent with our suggested instruction in *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 694 N.E.2d 916. We reject proposition of law XII.

### *Constitutionality of Death Penalty*

{¶ 114} We reject Cunningham's various constitutional challenges to Ohio death-penalty statutes in proposition of law XIII. Ohio's capital sentencing scheme is constitutional. See, e.g., *Clemons,* 82 Ohio St.3d at 454, 696 N.E.2d 1009; *State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668; *State v. Evans* (1992), 63 Ohio St.3d 231, 253-254, 586 N.E.2d 1042. Cunningham's international-law claims are rejected on the authority of *State v. Ashworth* (1999), 85 Ohio St.3d 56, 70, 706 N.E.2d 1231, and *Phillips,* 74 Ohio St.3d at 103-104, 656 N.E.2d 643.

## INDEPENDENT SENTENCE EVALUATION

### *Penalty Phase*

{¶ 115} At the penalty phase, Cunningham called three mitigation witnesses and made an unsworn statement. Tara Cunningham, Cunningham's sister, testified that their father abandoned the family when the children were young. Cunningham's mother, Betty, had a violent relationship with Cleveland Jackson Sr., Betty's live-in boyfriend and the father of Cleveland Jackson Jr., Cunningham's accomplice. Cleveland Sr. also physically abused the children,

including Cunningham. Betty stabbed Cleveland Sr. to death in front of the children.

{¶ 116} Tara said that Cunningham is a good brother. After Cleveland Sr.'s death, the children lived mainly with their grandmother because Betty was using drugs and sometimes abandoned the children for days at a time. During this time, Cunningham helped care for his siblings and "did a good job." Cunningham was not then close with his mother, and Tara claimed that Betty physically abused Cunningham. Betty had a string of boyfriends, and these boyfriends also physically abused Cunningham and the other children. Finally, Tara recalled three instances when children's services placed the children in foster homes.

{¶ 117} Betty Cunningham testified that Cunningham was the oldest of five children. His biological father, Larry, was not involved in his life. After Betty and Larry divorced, Betty lived with Cleveland Jackson Sr. Cleveland was a father figure to Cunningham, and he and Cunningham "got along well." Cleveland would "whip" the children with a belt "like any normal parent would." Betty would also "whip [Cunningham's] butt" with a belt to discipline him, but she denied allegations that she used a stick.

{¶ 118} Betty described her own relationship with Cleveland Sr. as abusive and said that the children witnessed this abuse. Betty ultimately grew tired of the abuse and stabbed Cleveland with a kitchen knife, killing him. She claimed that Cunningham and the other children witnessed the killing.

{¶ 119} When the children were younger, Betty never worked but received disability income. Cleveland Sr. contributed to the household income. Betty admitted that she did not properly care for her children because of her drug use and that her mother became their primary caretaker. Betty assumed that the children knew she was abusing drugs and alcohol and said that children's services became involved with the family when the children were relatively young.

{¶ 120} Betty denied being diagnosed with a mental illness. She admitted to a suicide attempt when her father died, but this incident occurred before she had children. Betty knows that her son did wrong but asked the jury to spare his life because he always visited her in the nursing home and she needs her son.

{¶ 121} Dr. Daniel L. Davis, a licensed forensic psychologist, conducted three evaluations of Cunningham, consulted with others, and examined various records relating to Cunningham. Prior to trial, Davis found that Cunningham was competent to stand trial and determined that he was sane at the time of the offenses.

{¶ 122} Davis also reviewed the mental-health records of Cunningham's parents. Cunningham's father, Larry, had a lengthy history of psychological problems. Larry spent a number of years in a psychiatric hospital in Alabama, and Cunningham had had virtually no contact with his father. The records that Davis reviewed indicated that Larry suffered from serious mental illness, most likely schizophrenia. Davis noted that he had not personally examined Larry, and he could not confirm this diagnosis within a reasonable degree of medical certainty.

{¶ 123} Davis also reviewed medical and mental-health records pertaining to Betty Cunningham. Betty has an extremely lengthy history of mental-health treatment, as well as substance-abuse problems, and a lengthy involvement with the Allen County Juvenile Court and Allen County Department of Children Services. Davis was able to interview Betty and described her as "an individual who throughout her adult life at least has not been able to care for herself or her children at an independent level" and remains that way today. He added that Betty, currently in a residential care setting, receives psychiatric medications as well as medications for her physical health.

{¶ 124} In Davis's view, having parents who are so damaged most likely had a very severe impact upon Cunningham "because children of mentally ill parents are at a greater risk to inherit the tendency for certain mental illnesses" and are at "greater risk for developing severe emotional problems." Davis also emphasized that being raised in an unstable home harmed Cunningham's chances of developing important social, educational, and vocational skills. Cunningham was often left alone and unsupervised. His mother abused illegal substances and alcohol. He was physically abused, lacked positive role models, and had multiple foster homes. Davis opined that Cunningham's parents' emotional problems, coupled with the environment he was raised in, made Cunningham more vulnerable to mental illness and behavioral problems.

{¶ 125} Davis found that Cunningham was not mentally retarded, but he did have an antisocial personality disorder and suffered from chronic depression. Cunningham also has a history of substance abuse that began in early adolescence. At age 16, Cunningham was an alcoholic who also abused cocaine and marijuana. Davis found that Cunningham's substance abuse "probably stems" from "self treatment of depression," "biological vulnerabilities," i.e., his mother's addiction to drugs and alcohol, and Cunningham's "association with negative peers."

{¶ 126} The first documented diagnosis of depression was in 1997, when Cunningham was incarcerated, but it was believed that Cunningham had suffered from depression since the age of 13. Davis diagnosed Cunningham as suffering from "major depression," though "not the kind of depression that is accompanied by severe symptoms of mental illness." This type of depression "comes and goes" and is often influenced by situations. Davis determined that Cunningham's depression is a mental disorder, not a mental illness, which is a "combination of the history factors" previously mentioned. Although Cunningham's depression

36

never rose to the level of a mental illness, Davis concluded that "it certainly did have an impact upon his functioning as a person."

{¶ 127} In Cunningham's unsworn statement, he told the jury that he knows it is impossible to take away the pain, misery, and grief that he caused. Cunningham took "full responsibility for [his] actions in this incident." He also said that he cannot bear the anger that the victims' families have towards him, but that he understands and is sorry. Finally, Cunningham asked the jurors to spare his life.

*Sentence Evaluation*

{¶ 128} In proposition of law III, Cunningham contends that his death sentence is inappropriate. He argues that his childhood, his role in the offenses, and his expressed remorse all favor a life sentence. Based on our independent review, we reject this argument. R.C. 2929.05.

{¶ 129} The jury convicted Cunningham of two death-penalty specifications: R.C. 2929.04(A)(5), aggravated murder as part of a course of conduct to kill two or more persons, and R.C. 2929.04(A)(7), aggravated murder during an aggravated robbery involving prior calculation and design. For purposes of sentencing, the trial court merged the two aggravating circumstances and submitted only the course-of-conduct specification to the jury.

{¶ 130} After independent assessment, we find that the evidence establishes beyond a reasonable doubt the R.C. 2929.04(A)(5) aggravating circumstance charged against Cunningham. As to both Count One, the murder of Jayla Grant, and Count Two, the murder of Leneshia Williams, the offenses were part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons.

{¶ 131} We find nothing in the nature and circumstances of the offenses to be mitigating. Cunningham and Jackson formulated a plan to rob Shane Liles, a known drug dealer. Cunningham forced Goodloe and Coron Liles at gunpoint

37

into Shane's kitchen, striking Coron in the face and breaking his jaw. Cunningham then held Goodloe, Coron, Armetta Robinson, Leneshia Williams, Tomeaka, James, and Jayla Grant at gunpoint in the kitchen while Jackson robbed Shane of money and drugs in an upstairs bedroom. After the hostages were forced to relinquish money, jewelry, and watches, Cunningham and Jackson opened fire on the group, killing Jayla and Leneshia and wounding the rest of the victims.

{¶ 132} Cunningham's history and background provide some mitigating features. Cunningham had a troubled, unstable upbringing and received little, if any, moral guidance, emotional support, or affection. Cunningham's father abandoned him at an early age and was not involved in his life. His mother has a lengthy history of mental-health and substance-abuse problems. Because of her problems, Betty failed to properly care for Cunningham. He was often neglected and abandoned; there were several reported instances of physical abuse and several referrals to children's services. Cunningham started abusing drugs and alcohol as a teenager and was believed to have suffered from depression since age 13. Cunningham never graduated from high school; he obtained his GED while incarcerated. In addition, when he was younger, Cunningham apparently saw his mother kill Cleveland Jackson Sr.

{¶ 133} We have upheld the death penalty against defendants with backgrounds similar to, or worse than, Cunningham's. See *State v. Campbell (2002),* 95 Ohio St.3d 48, 50-54, 765 N.E.2d 334; *Biros,* 78 Ohio St.3d at 455-457, 678 N.E.2d 891. In this case, we accord only modest mitigating weight to Cunningham's history and background. See, e.g., *Grant,* 67 Ohio St.3d at 486, 620 N.E.2d 50; *Jones,* 91 Ohio St.3d at 357, 744 N.E.2d 1163.

{¶ 134} We accord no weight in mitigation to Cunningham's character. Although Cunningham was described as a good son who cares for his mother and

a good brother who helped take care of his siblings, he was also a long-time abuser of drugs and alcohol and sold drugs as well.

{¶ 135} No evidence was presented in regard to R.C. 2929.04(B)(1) (victim inducement) or (B)(2) (duress, coercion, or strong provocation). Dr. Davis testified that Cunningham was sane at the time of the offenses and that he understood the wrongfulness of his acts. In addition, Cunningham was 29 years old at the time of the offenses and had previously been convicted of felonious assault involving a firearm. The mitigating factors in R.C. 2929.04(B)(3) (mental disease or defect), (B)(4) (youth of offender), and (B)(5) (lack of a significant criminal history) are therefore inapplicable.

{¶ 136} R.C. 2929.04(B)(6) (accomplice only) directly applies as a mitigating factor because Cunningham was indicted, tried, and convicted as an accomplice, not as a principal offender. Nevertheless, after reviewing the facts of this case, we give no weight to the R.C. 2929.04(B)(6) mitigating factor. Although the evidence does not establish that Cunningham actually killed either victim, *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, he was a crucial participant in the murders. But for Cunningham's involvement, Jayla Grant and Leneshia Williams would not have been killed. See *State v. Issa* (2001), 93 Ohio St.3d 49, 71, 752 N.E.2d 904.

{¶ 137} As to the R.C. 2929.04(B)(7) "other factor[s]," Cunningham's antisocial personality disorder, his depression, and his dependence on alcohol and drugs collectively deserve some weight in mitigation. See, e.g., *Wilson,* 74 Ohio St.3d at 400-401, 659 N.E.2d 292. Cf. *Biros,* 78 Ohio St.3d at 457, 678 N.E.2d 891 (defendant's personality disorder, lifelong alcohol dependence, and depression collectively entitled to some, but very little, weight in mitigation). The love and support of Cunningham's family also qualify as "other factor[s]" and are entitled to some weight. See, e.g., *Fox,* 69 Ohio St.3d at 194-195, 631 N.E.2d 124.

{¶ 138} Cunningham's personality disorder was likely the result of his troubled and dysfunctional upbringing. Nevertheless, we generally accord such disorders little weight. *State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 119; *Wilson,* 74 Ohio St.3d at 400-401, 659 N.E.2d 292. Cunningham's severe depression is a weak mitigating factor. See, e.g., *State v. White (1999),* 85 Ohio St.3d 433, 456, 709 N.E.2d 140. Davis testified that Cunningham's incarceration exacerbated his depression. Although Cunningham's depression "did have an impact upon his functioning as a person," Davis never indicated what role, if any, that depression played in these crimes. See, e.g., *State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶119; *White,* 85 Ohio St.3d at 456, 709 N.E.2d 140. Similarly, it has not been shown that Cunningham's substance abuse affected his judgment or played a part in these murders. Cf. *Hartman,* 93 Ohio St.3d at 306, 754 N.E.2d 1150. Finally, Cunningham's expression of remorse in his unsworn statement is entitled to little weight. See *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246 (remorse entitled to little weight in mitigation).

{¶ 139} Cunningham's collective mitigation evidence is modest when compared with the aggravating circumstance. Based on the evidence, we conclude that the course-of-conduct aggravating circumstance in Count One, the murder of Jayla Grant, outweighs Cunningham's combined mitigating factors beyond a reasonable doubt. We also find that the course-of-conduct aggravating circumstance in Count Two, the murder of Leneshia Williams, outweighs Cunningham's combined mitigating factors beyond a reasonable doubt. Therefore, we find that the sentence of death is appropriate in this case.

{¶ 140} Finally, we conclude that the death sentences imposed here are proportionate to death sentences affirmed in other cases of aggravated murder as a course of conduct involving the purposeful killing of two or more persons. See, e.g., *State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47; *State v. Frazier*

(1991), 61 Ohio St.3d 247, 574 N.E.2d 483; *State v. Cooey,* 46 Ohio St.3d 20, 544 N.E.2d 895; *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894.

**{¶ 141}** Accordingly, we affirm Cunningham's convictions and sentences, including the sentence of death.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

_____

David E. Bowers, Allen County Prosecuting Attorney, and Jana E. Gutman, Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, Public Defender, Pamela Prude-Smithers and Kelly L. Culshaw, Assistant Public Defenders, for appellant.

_____