[Cite as *State v. Rich*, 2013-Ohio-857.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.   CA2012-03-044 |
| | : | O P I N I O N |
| - vs - | | 3/11/2013 |
| | : | |
| ARON LAURENCE RICH, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2011-09-1434


Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster, Jr., Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Strauss Troy Co., LPA, Martin S. Pinales, Candace C. Crouse, Federal Reserve Bldg., 150 East Fourth Street, Cincinnati, Ohio 45202, for defendant-appellant


**RINGLAND, J.**

{¶ 1}   Defendant-appellant, Aron Laurence Rich, appeals from his conviction in the Butler County Common Pleas Court for complicity to trafficking in cocaine, trafficking in cocaine, possession of cocaine and a major drug offender specification.  For the reasons that follow, we affirm Rich's conviction.

{¶ 2}   On August 27, 2011, Hamilton Police Detective Joey Hamilton was investigating

a drug operation involving Rich and several others, including Daniel Rodriguez Rubio (Rubio) and Santiago Ayon-Sanchez (Sanchez), when he received information from a confidential informant (CI) that Rubio was waiting on a drug shipment to come into the area, that Rubio wanted the CI to rent a vehicle to be used in a drug transaction, and that Sanchez was going to be flown in from Los Angeles to participate in the transaction.

{¶ 3} Upon receiving this information, Detective Thompson rented a Chevy HHR and attached a magnetic Global-Positioning-System (GPS) tracking device underneath the vehicle's rear bumper to allow the detective to monitor the vehicle's movements via a GPS website and relay this information to his fellow police officers who would be conducting physical surveillance of the vehicle. Detective Thompson then transferred the vehicle to the CI. The CI used the HHR to pick up Rubio, and the two of them drove to the Dayton airport and picked up Sanchez, and then the three of them returned to Hamilton. The police had outfitted the CI with a wire, and therefore his conversations with Rubio and Sanchez were recorded.

{¶ 4} On August 29, 2011, Rich, along with Horacio Bernabe and Bhoj Ghale, traveled in a Chevy Aveo to the Wal-Mart on Cincinnati-Dayton Road, Butler County, Ohio (the Butler County Wal-Mart) and went inside the store. Shortly thereafter, Rubio and Sanchez, traveling in the HHR that Detective Thompson had provided to the CI, arrived at the Butler County Wal-Mart. Surveillance video from the store's parking lot shows that Rich, Bernabe and Ghale arrived at 6:11 p.m.; Rubio and Sanchez arrived nine minutes later.

{¶ 5} At 6:38 p.m., Rich, Bernabe and Ghale walked back to the Aveo in which they had arrived. After the three shook hands, Bernabe and Ghale got into the Aveo, while Rich entered the HHR that had been driven there by Rubio and Sanchez. Then the two vehicles left the Butler County Wal-Mart, with Bernabe and Ghale leaving together in the Aveo and Rich leaving, alone, in the HHR. Surveillance video from inside the Butler County Wal-Mart

showed that Rubio and Sanchez were still in the store at the time Rich left in the HHR.

{¶ 6} Cincinnati Police Officer Dan Kowalski, who was wearing plain clothes and driving an unmarked vehicle, was conducting physical surveillance of the suspects at the Butler County Wal-Mart. When Officer Kowalski saw Rich get into the HHR and drive away, he and several of his fellow officers began following Rich in the HHR and Bernabe and Ghale in the Aveo, as those two vehicles drove south into Hamilton County, Ohio and exited the highway onto Glendale-Milford Road, at which time the HHR and Aveo split up into different directions.

{¶ 7} Cincinnati Police Officer Colleen Deegan, who was also conducting physical surveillance of the suspects, saw the HHR drive near to the Wal-Mart on Glendale-Milford Road, Hamilton County, Ohio (Hamilton County Wal-Mart), and then saw the HHR execute an illegal U-turn and head in the opposite direction on I-75 North. Officer Deegan saw that the HHR was being driven by a white male. Rich is white; Bernabe and Ghale, like Rubio and Sanchez, are Hispanic.

{¶ 8} About 20 minutes later, Officer Deegan saw the HHR with the white male driver return to the Hamilton County Wal-Mart. The surveillance video from the Hamilton County Wal-Mart shows that at 7:17 p.m., Rich parked the HHR, got out and went inside the store. At 7:31 p.m., Rubio and Sanchez arrived at the store in Rubio's Lincoln Continental. Several minutes later, Rubio entered the HHR, which had been driven there by Rich, while Sanchez returned to the Lincoln. Rich, Bernabe and Ghale got into the Aveo. All three vehicles left the Hamilton County Wal-Mart, and shortly thereafter, all three vehicles were stopped by the police.

{¶ 9} No drugs were found in the Lincoln, which had been driven to the Hamilton County Wal-Mart by Rubio and then was driven away from that store by Sanchez, who was driving the vehicle at the time it was stopped. However, eight kilos of cocaine were found

inside a toolbox in the back of the HHR, which was being driven by Rubio at the time it was stopped by police. An additional two kilos of cocaine were later discovered in Rich's storage locker in a storage facility located on East Kemper Road, Hamilton County, Ohio. The street value of all the cocaine recovered was estimated to be $1.2 million dollars.

{¶ 10} The police discovered the cocaine in Rich's storage locker as a result of information they gathered from the GPS tracking device attached to the HHR. The police learned from the tracking device that after the HHR made the illegal U-turn witnessed by Officer Deegan, the vehicle traveled to the storage facility on East Kemper Road and stayed there for approximately ten minutes. The police learned from the storage facility's manager Amberlie Lawson that Rich had the rented storage locker in 2010 and that Lawson recognized Rich because he often came to his storage locker. After a drug dog "alerted" on Rich's storage locker, the police obtained a search warrant for the locker. When the police executed the warrant, they discovered two toolboxes that contained cocaine and crack cocaine. The police also found fingerprints on one of the toolboxes that were later determined to be Rich's fingerprints.

{¶ 11} An 11-count indictment was handed down against Rubio, Rich and Sanchez, charging them with various counts of complicity to trafficking in cocaine, trafficking in cocaine and possession of cocaine, with a major drug offender specification attached to each count. Five of the 11 counts in the indictment were directed at Rich, who was indicted on one count of complicity to trafficking in cocaine (Count Four), two counts of trafficking in cocaine (Counts Five and Seven), and two counts of possession of cocaine (Count Six and Eight), with a major drug offender specification attached to each of those five counts. Rubio and Sanchez subsequently entered into plea bargains with the state, while Rich chose to proceed to trial.

{¶ 12} Prior to trial, Rich moved to suppress the evidence seized by police as a result

of their warrantless use of the GPS tracking device to monitor the movements of the HHR that he drove on the day in question. Rich asserted that the police's warrantless use of the tracking device violated his Fourth Amendment rights against unreasonable searches and seizures.

{¶ 13} A hearing was held on Rich's motion to suppress, at which Detective Thompson testified for the state and Rich testified for the limited purpose of establishing that he had standing to bring a Fourth Amendment challenge to the police's warrantless use of the GPS tracking device. Rich testified that he received permission to use the HHR from one of his co-conspirators, Bernabe, but acknowledged that he did not know from whom Bernabe had received permission to use the vehicle.

{¶ 14} At the close of the hearing, the trial court overruled Rich's motion to suppress for two reasons:

{¶ 15} First, the trial court, citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421 (1978), noted that a defendant must have standing in order to challenge the constitutionality of a search or seizure; that nonowners of a vehicle generally do not have standing to raise such a challenge; and that even if a defendant is legitimately present in a vehicle, that fact does not necessarily give the defendant a legitimate expectation of privacy. The trial court found that the question of whether a person has a legitimate expectation of privacy turns on the facts and circumstances of each case, and that under the facts and circumstances of this one, Rich did not have a reasonable expectation of privacy in the HHR since he had obtained possession of that vehicle "several times removed" from the person who had rented it, i.e., Detective Thompson.

{¶ 16} Second, the trial court noted that leaving aside the issue of whether or not Rich had standing to challenge the constitutionality of the police's warrantless use of a GPS tracking device, the police did not need to obtain a warrant to install and use the GPS

tracking device on the HHR to track the vehicle's movements, given this court's decision in *State v. Johnson*, 190 Ohio App.3d 75, 2010-Ohio-5808 (12th Dist.). Following Rich's conviction, this court's decision in *Johnson* was vacated by the Ohio Supreme Court in *State v. Johnson*, 131 Ohio St.3d 301, 2012-Ohio-975.

{¶ 17} Several days later, the trial court overruled Rich's motion to compel the state to produce "all officer notes and summaries of actions taken in furtherance of the investigation of this matter by law enforcement." Rich's motion was made in response to the defense's having seen Detective Thompson refer to certain written notes during his testimony at the suppression hearing. The notes related to Detective Thomson's investigation of Rich and his co-conspirators. The trial court overruled the motion to compel, finding that the notes were "work product" and thus were exempt from disclosure under Crim.R. 16(J)(1).

{¶ 18} At Rich's three-day jury trial, the state presented testimony from a number of witnesses, including Detective Thompson and his fellow officers who followed and then arrested Rich on the day in question. The state also presented testimony from its fingerprint expert, Detective Mark Henson, who testified that the fingerprints found on one of the toolboxes in Rich's storage locker were Rich's fingerprints. The jury acquitted Rich of one count of trafficking in cocaine and one count of possession of cocaine, but convicted him of the remaining charges and specifications. The trial court sentenced Rich to serve ten years in prison and to pay a $10,000 fine.

{¶ 19} Rich now appeals, assigning the following as error:

{¶ 20} Assignment of Error No. 1:

{¶ 21} THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS.

{¶ 22} Assignment of Error No. 2:

{¶ 23} THE TRIAL COURT ERRED IN DENYING RICH'S CRIM.R. 29 MOTION FOR

ACQUITTAL.

{¶ 24} Assignment of Error No. 3:

{¶ 25} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO EXCLUDE THE STATE'S EXPERT WITNESS AT TRIAL.

{¶ 26} Assignment of Error No. 4:

{¶ 27} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO REQUIRE THE STATE TO TURN OVER A POLICE REPORT PRIOR TO TRIAL.

{¶ 28} In his first assignment of error, Rich argues the trial court erred in denying his motion to suppress from evidence any information gathered by police through their warrantless use of the GPS tracking device they installed on the HHR. Rich asserts that contrary to what the trial court held, he *did* have standing to challenge the warrantless use of a GPS device to track the HHR's movements because he had permission to drive the HHR. He cites several cases in support of his argument, including *State v. Brooks*, 12th Dist. No. CA99-01-002 (Dec. 6, 1999); and *State v. Mack*, 6th Dist. No. S-95-030, 1996 WL 21048, *3 (Jan. 19, 1996).

{¶ 29} Rich further argues the trial court erred when it found that even if he had standing to raise a constitutional challenge to the warrantless installation and use of a GPS tracking device on the HHR, the police still were not required to obtain a warrant prior to using the GPS tracking device to monitor the vehicle's movements, given this court's decision in *Johnson*, 190 Ohio App.3d at 758, 2010-Ohio-5808. Rich contends that *United States v. Jones*, __ U.S. __, 132 S.Ct. 945 (2012) "suggests that the [United States Supreme] Court is leaning toward concluding that the use of GPS technology to monitor a person's movements on public streets *is* a search under the Fourth Amendment." (Emphasis sic.) Therefore, Rich requests that this court find that the police's warrantless use of a GPS tracking device on the HHR to track the vehicle's movements was "an unconstitutional violation of [his] Fourth

Amendment rights, requiring suppression of all evidence gathered against him as 'fruits of the poisonous tree.'"

{¶ 30} In *Johnson*, the police attached a GPS tracking device to the undercarriage of a van owned by Johnson, a suspected drug trafficker. The officers placed the GPS tracking device on Johnson's van while it was parked at his home. The officers' use of the tracking device led to Johnson's arrest for drug trafficking. Johnson moved to suppress the evidence seized from him, arguing the warrantless installation and use of a GPS tracking device violated his Fourth Amendment rights against unreasonable searches and seizures. The trial court overruled the motion, and Johnson was convicted.

{¶ 31} On direct appeal, we affirmed the trial court's denial of Johnson's motion to suppress. This court held that a criminal defendant does not have a reasonable expectation of privacy in the undercarriage of his vehicle and that "placing the GPS on Johnson's van and monitoring its movements did not constitute a search or seizure under either the federal or Ohio constitutions." However, our decision in *Johnson* was vacated by the Ohio Supreme Court, which remanded the cause to the Butler County Common Pleas Court for application of the United States Supreme Court's decision in *Jones*, 132 S.Ct. 945. *State v. Johnson*, 131 Ohio St.3d 301, 2012-Ohio-975, ¶ 1.

{¶ 32} In *Jones*, the United States Supreme Court held that the government's attachment of a GPS tracking device to a vehicle and its subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a "search," for purposes of the Fourth Amendment. *Id.* at 949. Rich acknowledges that *Jones* cannot be viewed as controlling in this case, since *Jones* involved a "classic trespassory search," see *id.* at 954, in which the government attached a GPS device to a vehicle registered to the wife of the defendant in that case, Jones. Jones' wife who had given him permission to drive the vehicle, and the government acknowledged that Jones was the "exclusive driver" of the

vehicle, and the defendant was in possession of the vehicle at the time the device was attached. *Id.* at 948.

{¶ 33} In this case, by contrast, the police installed the GPS tracking device on the HHR *before* Rich took possession of the vehicle, and therefore there was no trespass in this case. Nevertheless, Rich argues the *Jones* court recognized that "trespass" is not the exclusive test for determining whether a Fourth Amendment violation occurred and that under *Jones*, situations involving merely the transmission of electronic signals without trespass remain subject to the analysis called for by *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507 (1967).

{¶ 34} The *Katz* approach to whether Fourth Amendment protections apply in a given circumstance involves a two-part inquiry: (1) whether the individual exhibited a subjective expectation of privacy, and (2) whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable. See *United States v. Knotts*, 460 U.S. 276, 280-281, 103 S.Ct. 1081 (1983) (discussing *Katz*).

{¶ 35} Rich argues he had a subjective expectation of privacy that the police would not use a GPS tracking device to track his every move and that his subjective expectation of privacy should be recognized by society as an objectively reasonable one. We disagree. The facts show that Rich received permission to use the HHR from one of his co-conspirators, Bernabe, who had received permission to use the vehicle from another of their co-conspirators, Rubio, who had received permission to use the vehicle from the CI, who had received the vehicle from Detective Thompson. We agree with the trial court that under these circumstances in which Rich was "several times removed" from the person who rented the vehicle, i.e., Detective Thompson, Rich did not have an objectively reasonable expectation of privacy in the vehicle.

{¶ 36} There is an additional reason for upholding the trial court's ruling in this case.

In *Davis v. United States*, __ U.S. __, 131 S.Ct. 2419, 2423-2424 (2011), the court held that "searches conducted in objectively reasonable reliance on *binding appellate precedent* are not subject to the exclusionary rule." (Emphasis added.) In so holding, the United States Supreme Court relied on the "good faith" exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897, 907-921, 104 S.Ct. 3405 (1984) and its progeny. Relying on *Davis*, other courts have found that the good-faith exception, as discussed in *Davis*, will apply where binding appellate precedent had previously authorized warrantless GPS monitoring. *See, e.g.*, *United States v. Aquilar*, D.Idaho No. 4:11-cr-298-BLW, 2012 WL 1600276 (May 7, 2012); and *United States v. Heath*, D.Mont. No. CR 12-4-H-DWM, 2012 WL 1574123 (May 3, 2012).

**{¶ 37}** In this case, there was "binding appellate precedent" that previously authorized warrantless GPS monitoring in this appellate district, namely, our decision in *Johnson*. Our decision in *Johnson* was adopted by the First District in *State v. Winningham*, 1st Dist. No. C-110134, 2011-Ohio-6229, which like *Johnson*, was later vacated by the Ohio Supreme Court and remanded to the Hamilton County Common Pleas Court for application of *Jones*. *State v. Winningham*, 132 Ohio St.3d 77, 2011-Ohio-1998, ¶ 2.

**{¶ 38}** Rich points out that there were other appellate districts in this state that disagreed with our decision in *Johnson*; that the issue of whether or not warrantless GPS monitoring was constitutional had been appealed to the Ohio Supreme Court; and that *Jones* was pending before the United States Supreme Court at the time Rich was being tried in this case. However, the police in this district had both a right and a duty to follow this court's decision in *Johnson* until it was overruled by a higher court, which did not occur until after Rich was convicted and sentenced in this case. As a result, we find that the "good-faith" or "binding appellate precedent" exception set forth in *Davis* applies to this case, and therefore this case is not subject to the exclusionary rule. Accordingly, the trial court did not err in

overruling Rich's motion to suppress.

{¶ 39} In light of the foregoing, Rich's first assignment of error is overruled.

{¶ 40} In his second assignment of error, Rich asserts that the trial court erred in denying his Crim.R. 29 motion for acquittal because the state failed to prove beyond a reasonable doubt that Butler County was the proper venue for trial on any of the counts with which he was charged and convicted. This argument lacks merit.

{¶ 41} In reviewing a trial court's denial of a Crim.R. 29 motion for acquittal, this court applies the same standard used for determining whether a conviction is supported by sufficient evidence, i.e., we examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Roy*, 12th Dist. No. CA2009-06-168, 2010-Ohio-2540, ¶ 29; and *State v. Hibbard*, 12th Dist. Nos. CA2001-12-276, CA2001-12-286, 2003-Ohio-707, ¶ 9. "After viewing the evidence in a light most favorable to the prosecution, the relevant inquiry is whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259, paragraph two of the syllabus.

{¶ 42} Article I, Section 10 of the Ohio Constitution requires a criminal defendant to be tried in "the county in which the offense is alleged to have been committed." R.C. 2901.12(A) provides that venue lies in any jurisdiction in which an offense or any element thereof is committed. Although venue is not a material element of an offense, it is a fact that the state must prove at trial beyond a reasonable doubt unless waived. *State v. Draggo*, 65 Ohio St.2d 88, 90 (1981). "For venue to be proper there must be a 'significant nexus' between one or more of the elements of an offense and the county in which the charge is brought." *Id.*

{¶ 43} R.C. 2925.02(A)(3) prohibits a person from preparing a controlled substance for

shipment. The state presented ample evidence at trial to show that the *planning* and *preparation* for Rich's crimes of conspiracy to trafficking in cocaine, trafficking in cocaine, and possession of cocaine took place in Butler County. The state's evidence showed that the HHR Rich drove was rented in Butler County. Moreover, Rich's actions that culminated in his convictions were part of a "course of criminal conduct," under R.C. 2901.12(H). While Rich's crimes may have been *finished* in Hamilton County, they were *started* in Butler County, and therefore Butler County was a proper venue for Rich's trial. *Id.*

{¶ 44} Therefore, Rich's second assignment of error is overruled.

{¶ 45} In his third assignment of error, Rich argues the trial court abused its discretion when it permitted the state's fingerprint expert, Detective Henson, to testify at trial because the state failed to provide the defense with a "complete expert report," prior to trial, as required by Crim.R. 16(K). Therefore, Rich contends, the trial court was required under that rule to exclude Detective Henson's expert testimony. We find this argument unpersuasive.

{¶ 46} Crim.R. 16(K) states in pertinent part:

> **(K) Expert Witnesses; Reports.** An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶ 47} Prior to trial, the state provided the defense with an "Evidence Submission Form" prepared by Detective Henson, which discussed two fingerprint images taken from one of the toolboxes found in Rich's storage locker. The evidence submission form indicated that one of the fingerprint images contained seven characteristics that matched Rich's "#2" finger, and the other contained five characteristics that matched Rich's "#3" finger. The form

concluded that the fingerprint images "are simultaneous latent prints with 12 total matching characteristics of fingers #2 & #3, simultaneous fingers of Aaron [*sic*] Rich."

{¶ 48} Immediately before calling Detective Henson to the witness stand, the state provided the defense with Detective Henson's PowerPoint presentation which he intended to present to the jury. The presentation stated that one of the two latent fingerprints found on the toolbox actually had eight, and not just seven, matching characteristics with Rich's known fingerprint, and that a third latent fingerprint had been found on the toolbox that had at least four characteristics that matched Rich's known fingerprint. The presentation concluded that the "[s]imultaneous latent prints [found on the toolbox] matched against the simultaneous known prints of Aaron [*sic*] Rich have a total of 17+ matching characteristics."

{¶ 49} Upon receiving a copy of the PowerPoint presentation, Rich requested that it be excluded from evidence because it had not been turned over to the defense as required by Crim.R. 16. The trial court overruled Rich's objection, finding that Crim.R. 16(K) required only a *summary* of the expert witness's testimony and not "the finished product or exact word for word." However, the trial court stated that if Detective Henson's testimony regarding his PowerPoint presentation contained any new information that had not been contained in the material provided to the defense during discovery, including the evidence submission form, the defense was to call that to the trial court's attention, at which time the trial court would strike any of the new information from Detective Henson's testimony. The trial court also agreed to adjourn the trial early that day following Detective Henson's direct examination so that the defense could carefully examine his PowerPoint presentation.

{¶ 50} Detective Henson presented his PowerPoint presentation to the jury, informing them that two fingerprints had been found on the toolbox that had a total of 13 (and not just 12) characteristics that matched Rich's known fingerprints, and that a third fingerprint was also found on the toolbox that had at least four characteristics that matched Rich's known

fingerprint, for a total of 17-plus (and not just 12) characteristics that matched Rich's known fingerprints.

{¶ 51} The following day, the defense renewed its objection to not receiving Detective Henson's PowerPoint presentation before trial. When the trial court asked the defense if Detective Henson had testified to anything that had not been contained in the material that had been provided to them prior to trial, including the evidence submission form, the defense responded that Detective Henson had testified "[m]ore completely" in that he "testified with his analysis and how he reached it, and it is the analysis that is contained in [the PowerPoint presentation]." When the trial court asked the defense if there was anything else, the defense responded, "no."

{¶ 52} In support of his assertion that the state violated Crim.R. 16(K) by failing to provide him with "a complete expert report[,]" Rich calls to our attention that Detective Henson's PowerPoint presentation contained new information that had not been contained in the evidence submission form, namely, that there were three fingerprints uncovered from the toolbox, and not just two, with 17-plus total characteristics, and not just 12, that matched Rich's known fingerprints. However, Rich is ignoring the trial court's instruction to the defense to bring to its attention any new information contained in Detective Henson's testimony at trial regarding his PowerPoint presentation that had not been contained in the material provided to the defense before trial, including the evidence submission form. Rich is also ignoring the trial court's offer to strike any such new information from Detective Henson's testimony if the defense brought it to the trial court's attention. However, the only objection the defense raised to Detective Henson's testimony was that Detective Henson had testified "[m]ore completely[,]" in that he testified as to his analysis and how he arrived at it.

{¶ 53} Therefore, the only issue properly before us is Rich's argument that Detective Henson's expert report regarding the fingerprints found on the toolbox should have been

"more complete." What Rich means by this is, while the state provided him with a summary of Detective Henson's *conclusions*, the state failed to provide him with a summary of Detective Henson's *analysis*, and therefore the trial court was obligated under Crim.R. 16(K) to exclude Detective Henson's testimony for this reason. We find this argument unpersuasive.

{¶ 54} Crim.R. 16(K) requires an expert witness for either side to "prepare a written report *summarizing* the expert witness's testimony, findings, analysis, conclusions, *or* opinion[.]" (Emphasis added.) Rich is essentially asking this court to interpret Crim.R. 16(K) to require expert witnesses to provide a written report with a *summary* of the expert's *testimony*, a *summary* of the expert's *findings*, a *summary* of the expert's *analysis*, a *summary* of the expert's *conclusions*, *and* a *summary* of the expert's *opinion*. However, Rich has failed to cite any case law that supports his suggested interpretation of Crim.R. 16(K), nor are we aware of any. We conclude that the state complied with Crim.R. 16(K) when, during pretrial discovery, it provided the defense with the evidence submission form prepared by Detective Henson which contained a summary of Detective Henson's findings and conclusions that the fingerprints found on the toolbox were Rich's fingerprints.

{¶ 55} Furthermore, the state's purpose in admitting Detective Henson's fingerprint expert testimony was to provide additional circumstantial evidence that tied Rich to the cocaine found in his storage locker. However, this testimony was merely cumulative to other overwhelming circumstantial evidence that the state presented that tied Rich to his storage locker in which a large amount of cocaine was discovered in the toolboxes located there. Included in this other circumstantial evidence is the fact that the storage locker had been rented by Rich in June 2010, the manager of the storage facility, Lawson, was able to identify Rich at trial because Rich had come to his storage locker often, and that, on the day in question, Rich's storage locker was accessed at the same time he was observed driving to

and from the area where the storage facility was located.

{¶ 56} Given the foregoing, Rich's third assignment of error is overruled.

{¶ 57} In his fourth assignment of error, Rich argues the trial court abused its discretion when it refused to compel the state to turn over to him, prior to trial, Detective Thompson's written investigative notes, the existence of which came to light at the hearing held on Rich's motion to suppress. Rich asserts that these notes constitute a "police report," for purposes of Crim.R. 16(B)(6), and that the trial court committed reversible error in refusing to order the state to disclose them to the defense. We disagree.

{¶ 58} Detective Thompson's written notes summarize the conversations that occurred between the CI, Rubio and Sanchez on their August 27, 2011 trip to and from the Dayton Airport. The notes also record the movements of Rich, Rubio, Sanchez, Bernabe and Ghale from 6:00 p.m. to 7:48 p.m. on August 29, 2011, and the observations of the suspects' movements made by Detective Thompson's fellow officers that day. During his testimony at the suppression hearing, Detective Thompson referred to the notes in question to refresh his memory of the events surrounding his investigation of Rich. Rich's counsel argued that Detective Thompson's notes constituted a police "report," for purposes of Crim.R. 16(B)(6), and therefore the state was obligated under that rule to turn them over to the defense during discovery. Several days later, Rich's counsel filed a motion to compel production of Detective Thompson's notes. The trial court overruled Rich's motion to compel on the basis that the notes he sought constituted "work product" and therefore did not need to be disclosed under Crim.R. 16(J)(1).

{¶ 59} We note, parenthetically, that Rich's defense counsel failed to ask the trial court to order the state to produce Detective Thompson's written investigative notes under Evid.R. 612. That rule provides that if a witness uses a writing to refresh his memory for purposes of testifying, the adverse party is entitled to ask the trial court to order the writing to be produced

so that the adverse party can inspect the writing and cross-examine the witness about it. *Id.* The trial court may order the writing to be produced if the trial court determines it is necessary and in the interests of justice to do so. Had Rich requested the trial court to order that Detective Thompson's notes be produced under Evid.R. 612, Rich would have been entitled to, at least, ask the trial court to determine that it was necessary and in the interests of justice to require the state to produce the notes so that he could inspect them, cross-examine Detective Thompson about them, and introduce into evidence any portion of them relating to Detective Thompson's testimony. *Id.*

{¶ 60} Crim.R. 16, which was amended in 2010, provides in relevant part:

(B) Discovery: Right to Copy or Photograph.    Upon receipt of a written demand for discovery by the defendant, and except as provided in division (C), (D), (E), (F), or (J) of this rule, the prosecuting attorney shall provide copies or photographs, or permit counsel for the defendant to copy or photograph, the following items related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, within the possession of, or reasonably available to the state, subject to the provisions of this rule:

* * *

(6) All reports from peace officers * * * [.]

* * *

(J) Information Not Subject to Disclosure.  The following items are not subject to disclosure under this rule:

(1) Materials subject to the work product protection. Work product includes, but is not limited to, reports, memoranda, or other internal documents made by the prosecuting attorney or defense counsel, or their agents in connection with the investigation or prosecution or defense of the case[.]"

{¶ 61} The 2010 Staff Notes to Crim.R. 16 state that division (B) "expands the State's duty to disclose [prior to trial] materials and information beyond what was required under the

prior rule" and that division (J) "clarifies what information is not subject to disclosure by either party for reasons of confidentiality, privilege, or due to their classification as documents determined to be work product."

{¶ 62} Prior to 2010, Crim.R. 16 stated, in pertinent part:

> (B)(2) Except as provided in subsection (B)(1)(a), (b), (D), (f), and (g), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of the statements made by the witnesses or prospective witnesses to state agents.

{¶ 63} In *State v. Carballo*, 12th Dist. No. CA88-02-006, 1989 WL 121077, *2-3 (Oct. 16, 1989), this court held that a police officer's notes and surveillance log of a defendant's activities were police investigation materials that fell within former Crim.R. 16(B)(2), and thus were not discoverable by the defense. *See also State v. Lusane*, 8th Dist. No. 42048, 1980 WL 355359, *4 (Dec. 11, 1980) (trial court properly refused to order that a police report be included in the record, since "[t]he prosecution has no duty to reveal, and the [trial] court has no authority to compel the prosecution to reveal, the work-product of the police"). However, *Carballo* and *Lusane* were both decided before the current version of Crim.R. 16 became effective in 2010. Crim.R. 16(B)(6) now requires "[a]ll reports" from "peace officers" like Detective Thompson to be disclosed to criminal defendants like Rich upon written demand.

{¶ 64} The first question that must be addressed is whether Detective Thompson's notes are a police "report" for purposes of Crim.R. 16(B)(6). Rich asserts that Detective Thompson's notes should be deemed to be a police "report" under Crim.R. 16(B)(6), because Detective Thompson used his notes "just like a police report, in that he referred to them during his testimony at the suppression hearing in order to refresh his recollection regarding the facts of the case." Rich further asserts that allowing the state to label all such reports as "informal" or "personal notes" would render Crim.R. 16(B)(6)'s requirement of turning over

"[a]ll reports from peace officers" meaningless.

**{¶ 65}** The state argues that only "official" reports, such as the initial reports of an offense, reports of an incident taken at the scene and arrest reports, are the type of reports that must be provided in discovery under Crim.R. 16(B)(6). The state asserts that a police officer's notes are not a "report," under Crim.R. 16(B)(6), because "logic" dictates that "Crim.R. 16(B)(6) only intended to include systematic, pre-existing *forms* created in conjunction with incidents and arrests." (Emphasis sic.) The problem with this argument is that if the drafters of Crim.R. 16(B)(6) had intended such an interpretation, it is difficult to understand why they would not have expressly said so.

**{¶ 66}** The state argues, in the alternative, that a police officer's notes are entitled to "work product" protection under Crim.R. 16(J)(1), which, the state contends, is "virtually identical" to former Crim.R. 16(B)(2). Rich counters that the work product exception set forth in Crim.R. 16(J)(1) does not apply to police reports since the police are not the "agents" of the prosecuting attorney. However, Rich's argument ignores the language in Crim.R. 16(J)(1) that states, "[w]ork product includes, but is not limited to * * *." We conclude that the work product protection clause in Crim.R. 16(J)(1) can apply to the "work product" of the police, as well as to that of prosecutors, defense attorneys or their agents. The question that remains is whether Detective Thompson's notes constitute "work product" that is entitled to protection under Crim.R. 16(J)(1).

**{¶ 67}** "Work product," as used in connection with the contents of police reports, has been traditionally defined as those portions of the report that contain "'the officer's investigative decisions, interpretations and interpolations[.]'" *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, ¶ 43, quoting *State v. Jenkins*, 15 Ohio St.3d 164, 225 (1984). The portions of a police report that are found to constitute work product are "'privileged and excluded from discovery under Crim.R. 16[.]" *Cunningham*, quoting *Jenkins*.

{¶ 68} The information in Detective Thompson's notes could be interpreted as containing material related to the "investigative decisions" of Detective Thompson and his fellow officers. Even if they could not, we still would find any error the trial court may have committed in not ordering the state to disclose the notes to Rich to have been harmless. Most, if not all, of the information contained in the notes came out during the trial, none of the information in the notes was exculpatory, and none of the information would have been of material assistance to Rich in preparing his defense. See Crim.R. 16(B). Nevertheless, we would call to the state's attention the language in the 2010 Staff Notes to Crim.R. 16(A), which states that "[n]othing in this rule shall inhibit the parties from exchanging greater discovery beyond the scope of this rule." The material the state refused to disclose to Rich appears to be unremarkable, and it is puzzling to this court as to why the state would risk reversal by not disclosing such information.

{¶ 69} In light of the foregoing, Rich's fourth assignment of error is overruled.

{¶ 70} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.