[Cite as *State v. Dine*, 2024-Ohio-2294.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | Case No. 2023CA00087 |
| | : | |
| BRADD DINE | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Stark County Court of
                             Common Pleas, Case No. 2022CR2096


JUDGMENT:                    AFFIRMED


DATE OF JUDGMENT ENTRY:      June 13, 2024


APPEARANCES:


For Plaintiff-Appellee:                    For Defendant-Appellant:

KYLE L. STONE                              D. COLEMAN BOND
STARK CO. PROSECUTOR                       116 Cleveland Ave. NW
LISA A. NEMES                              Suite 600
110 Central Plaza South, Ste. 510          Canton, OH 44702
Canton, OH 447702-1413

*Delaney, P.J.*

{¶1} Appellant Bradd Dine appeals from the July 18, 2023 Judgment Entry of the Stark County Court of Common Pleas. Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} This case arose in the early morning hours of September 19, 2023, when Officer Schilling of the Canton Police Department was dispatched to pick up a wanted individual—appellant—from a house on Benskin Avenue in the city of Canton. Schilling is a K-9 patrol officer and assistant trainer for the department's K-9 unit.

{¶3} Appellant was believed to be alone in the house, asleep on a couch in the front room. Schilling coordinated a plan with other officers: two would knock at the front door, make contact with appellant, and take him into custody. Schilling would take a position in the rear of the house with his K-9 partner in case appellant attempted to flee. Schilling's K-9 partner accompanied officers primarily for protection but also with the possible option of sending the dog into the house.

{¶4} Upon arrival, officers knocked at the front door and Schilling heard a male voice yelling inside, seemingly irate. He saw a white male with longer black hair. Schilling moved toward the rear of the house and noticed appellant looked out the window and saw him and his K-9 partner. Appellant then ran back to the front of the house. Schilling reported the situation to Sgt. Wilkes.

{¶5} Wilkes responded to the Benskin house where officers were attempting to arrest appellant on a warrant and reporting that the subject inside the house refused to identify himself. Appellant was yelling out the windows that he wasn't the person they were looking for, claiming his name was "Eric" but he didn't have any I.D. Wilkes asked

appellant to show his face so officers could confirm whether he was the person they sought. Appellant eventually pulled back the blinds, revealed his face, and asked whether he was the person they were looking for. Wilkes went to his vehicle and confirmed that the photo of the subject they sought was appellant, which it was, and officers confirmed he was absolutely the person they were looking for. Appellant still refused to come out of the house.

{¶6} Around 1:30 a.m., Schilling gave his K-9 the "bark" command, prompting the dog to bark repeatedly and to get appellant's attention, telling him the dog would be released into the house if appellant refused to surrender and the dog would bite. Appellant still refused to surrender and threatened to shoot the dog. Appellant also threatened, "You know what? If you guys came in I'd fucking shoot you, too. I didn't do nothing wrong. I'm just defending myself." Appellant's threats to officers and the K-9 led Wilkes to contact his lieutenant and seek authorization for the SWAT team to respond.

{¶7} Officers repeatedly told appellant to come to the front door because they had a warrant for his arrest. Appellant responded, "It's gonna be a real bad day. And I'm gonna wind up dead and so are one of you mother fuckers." The exchange lasted almost ten minutes. Schilling declined to send the K-9 into the house because at 1:39 a.m., appellant fired off a round.

{¶8} Upon hearing the gunshot, the situation intensified. Schilling moved to a position of hard cover behind a vehicle at the corner of a detached garage and put the K-9 away. Officers waited for the SWAT team to arrive.

{¶9} Captain Marino of the Canton Police Department is commanding officer of the SWAT team. In the early morning hours of September 19, 2022, a shift commander

contacted him to request a SWAT response to a house on Benskin Avenue. Marino confirmed approval for the SWAT response, alerted SWAT members and relayed information about the situation on Benskin.

{¶10} Ptl. Kruger of the Massillon Police Department is assigned to the Canton Regional SWAT team and received the call to respond to an "armed barricade with shots fired." Kruger was the first SWAT member on scene; he arrived to find Canton's patrol division had established a perimeter around the house and was actively making announcements.

{¶11} Detective Hampton of the Canton Police Department's Special Investigations Unit is also a SWAT member and received the call about an armed, barricaded subject on September 19, 2022. Hampton gathered his gear and reported to the scene, where his supervisor advised shots had been fired by appellant, who was inside the house, and officers had set up a perimeter.

{¶12} Captain Marino arrived on scene and waited for the SWAT truck to arrive. He then positioned the truck and stationed himself in the passenger seat, with access to a phone, radio, and a PA system enabling him to give verbal commands to the subject in the house. Acting as the incident commander, Marino kept visual contact with the house and set up a plan for the officers.

{¶13} Officers donned their equipment and communicated with Marino about the plan. Kruger was assigned to assist with the gas team and equipped with a 40-millimeter gas launcher which shoots canisters of gas munitions. The gas launcher does make a "bang" sound but not as loud as a typical firearm. The gas is a non-lethal irritant intended

to facilitate the goal of containing an individual by making it difficult to see and breathe, causing discomfort to anyone officers attempt to remove from the area.

{¶14} Schilling remained "pinned down" at the rear of the house so Kruger and Hampton were assigned to that area. The K-9 cruiser also remained parked at the rear of the house.

{¶15} Deputy Burns of the Stark County Sheriff's Department was also a SWAT member who received a call that morning to respond to an individual barricaded inside a house. He donned his gear and drove straight to the scene, where he was assigned to the gas team to provide cover for Kruger.

{¶16} Officer Jatich of the Canton Police Department is also a member of the SWAT team and was deployed for a "full team activation for armed barricade with shots fired" on September 19, 2022. Jatich deployed in his take-home cruiser with his K-9 partner. Jatich arrived on scene at the same time as an armored vehicle and most of the SWAT contingent was present or arriving shortly. Jatich took a position on the perimeter with Schilling, Burns, Hampton, and Kruger, with the goal of containing the suspect.

{¶17} Schilling stood at the rear of the house, near the corner of detached garage with Hampton, explaining appellant's position in the house and indicating the windows in which appellant had appeared. Other SWAT team members including Kruger, Burns, and Jatich were nearby at the rear of a neighbor's house.

{¶18} Between 1:40 a.m. and 2:30 a.m., officers communicated with appellant in an attempt to get him to surrender peacefully. At 2:33 a.m., appellant fired another round. Schilling and Hampton, cautioning other officers about potential crossfire, joined officers

stationed behind a neighbor's house. Schilling had a direct line of sight into the house and could occasionally see appellant as he moved around inside the house.

{¶19} At 2:33 a.m., Schilling implored appellant to come to the door or to come out and surrender peacefully. Appellant shouted from the middle window on the second story, "No, I'm not surrendering peacefully, man." Appellant again refused to comply when Schilling said, "Hey, Bradd, the SWAT team is here. Come out and talk to us."

{¶20} Marino attempted to communicate with appellant via the PA system, but that manner was unsuccessful. Marino instead opted to obtain appellant's phone number from dispatch and called him directly, hoping to de-escalate the situation. Appellant was anxious and agitated when speaking to Marino. At one point he requested cigarettes and an attorney. Police provided cigarettes in an attempt to build rapport, to no avail. Appellant told Marino if he came out of the house, they would have to "shoot it out." Appellant stated he didn't want to shoot it out but would do so.

{¶21} Marino told appellant he wanted him out of the house and no officers hurt. Appellant responded, "What do I gotta do to get you to fucking put on in my head?" Appellant asked whether if he "sent off a shot or two" officers would shoot him in the head. Marino responded no, they did not want to shoot him. Appellant responded, "Alright, well I'm bout to test that theory out, then." Appellant detailed his plan to Marino: he was sitting in the bathtub with five bullets left in his gun, four that he intended to "send[ ] at fucking officers" and one for himself, although he hoped the police would "plug" him before anyone died.

{¶22} The SWAT team maintained their positions, waiting on instructions from Marino. Jatich could periodically see appellant on the second floor through a bathroom

window, telling officers they would have to come inside to kill him and he would shoot them if they did so. Officers waited in preparation to deploy the gas munitions into the house or obtain a search warrant to enter the house. A sniper team kept eyes on appellant as he paced throughout the house.

{¶23} Marino talked to appellant on and off for hours but eventually concluded no progress was being made. Marino sensed appellant was becoming more agitated. Police obtained a search warrant for the house and prepared to execute a gas plan, the purpose of which was to deny the occupant access to certain parts of the structure of the house, with the goal of giving the subject access to fresh air on the first floor of the house so he comes out and surrenders peacefully. In the instant case, the plan was for Kruger to deploy gas while other officers provided him with cover. Kruger determined the first room to strike with gas should be the bathroom.

{¶24} The command was made to launch gas into the house. Burns, armed with a rifle, and Kruger, holding the gas launcher, went by the garage to launch the first round of gas. Schilling and other officers stationed behind the neighbor's house provided cover while Kruger deployed the gas munitions. Hampton provided cover at a side door near the rear of the house because officers could not anticipate whether appellant might try to exit through that door. Kruger launched gas canisters into the side of the house where he was stationed with Schilling, Jatich, Hampton, and Barnes. Another officer deployed gas into a different corner of the house.

{¶25} After Kruger deployed gas into the second-floor bathroom, appellant responded with gunfire coming out of the bathroom window. Officers could hear appellant screaming profanity, and gunfire coming from the bathroom. Burns observed that once

the gas canisters went into the window, "rounds came out."  Kruger deployed a second round of gas which seemed to knock out the lights in the room.

{¶26} Appellant came to the window and pointed a gun in the direction of Kruger and other officers around him. Kruger was "a hundred percent" certain appellant aimed the gun at him; Kruger saw the muzzle flash from the gun in appellant's hand, heard the bang, and ducked behind the back corner of the neighbor's house. Appellant fired off at least two and possibly three rounds.

{¶27} Officers called out to "pull back" and requested coverage because appellant was firing out the window. Jatich heard three or four rounds fired from the window, and observed a partial silhouette of appellant and a pistol in the window.  Jatich observed appellant point the gun toward the officers on the corner, and toward the neighbor's house.  He saw the muzzle flash when appellant fired the gun.

{¶28} Hampton heard gunshots coming from the house but was not at a desirable vantage point and couldn't see into the windows.  He retreated from the door to get into a better position to cover other officers.  Marino observed some of the shots fired from his position in the SWAT truck; he saw "two distinct shots coming out of the house," one of which went through the roof and the other came out of a second-floor window on the north side of the house.

{¶29} When Dine came to the window and fired on officers, two officers without cover in the driveway had to retreat.  Burns and Hampton recalled "running for their lives." Kruger remained facing the window with the ability to see inside.  Kruger drew his sidearm and directed his flashlight into the window, but appellant had retreated into the house and was no longer visible.

{¶30} Appellant's shots did not strike any officers. Jatich opined the gas inhibited appellant's ability to get an accurate sight of the officers, and instructed Kruger to continue launching gas to prevent him from doing so. Officers advised appellant the gas would only stop if he came out of the house. In total, Kruger fired 11 canisters of gas into the house.

{¶31} Appellant opened the top bedroom window and stuck his head out get fresh air. Officers spotted him and ordered him to put his hands up. Appellant was hanging half-in and half-out of the window, arms dangling, pleading for help and telling officers he was trying to come out. Upon appellant's surrender, Marino sent a team into the house; officers breached the front door, went upstairs, and apprehended appellant.

{¶32} As appellant was secured, Jatich and Burns checked the house next door to ensure the safety of the residents. On the second floor of the neighbors' house, police found a window with fresh damage caused by a gunshot, but did not find the bullet that caused the damage.

{¶33} The Neighbors include Jane Doe, her sister Mary Doe, and Mary's boyfriend John Roe. Jane Doe's bedroom is on the second floor, on the side of the house closest to appellant's house. Around 1:30 a.m. on September 19, 2022, Jane Doe was awakened by the sound of a dog barking. She looked outside when she heard someone being Mirandized and calling for help. She saw police officers running through the yard. Eventually things quieted down and Jane attempted to go back to sleep, but started to read instead.

{¶34} Jane Doe overheard the standoff between appellant and the SWAT team, and saw some of it, as the standoff progressed through the night and into the early

morning. Around 4:30 a.m., Jane's alarm clock went off and she started getting ready for work. She looked out her bedroom window again and saw officers near her house. She then heard a loud "bang" and debris struck her bedroom window. Jane realized she wasn't safe and ran downstairs. She heard multiple shots.

{¶35} After the shooting ended, officers arrived at Jane's door to check on the occupants. They told Jane they believed her house had been hit, and she brought them upstairs to show them the damaged window.

{¶36} Appellant's recorded phone calls from jail were played at trial. Appellant made various incriminating statements: he said he took a "speedball" before the standoff began; admitted he had a shootout with the SWAT team; admitted he shot at the SWAT team; claimed to have fired one shot at his own head but missed; said he fired one shot through the wall and one down the stairs because he thought an officer was coming upstairs; said he didn't aim at anyone in particular; said he "shot up the house;" and admitted he shot out of the windows of the house. Appellant said his "story" was that he hadn't shot at anyone in particular so he could get the felonious assault charges dropped.

{¶37} After appellant was arrested, an investigation was launched. Police found one bullet hole in a bedroom wall and two .9-millimeter casings on the floor. In the bathroom, two more casings were on the floor and a bullet was lodged in the bathroom wall. In another bedroom, a casing was on the floor and a syringe and a firearm were on the nightstand. A magazine was removed from the firearm and found to contain one chambered round. Outside appellant's house, police found a bullet fragment in the driveway.

{¶38} Investigators seized appellant's firearm, ammunition, magazine, and five spent cartridge cases, and submitted the evidence to BCI for analysis. Microscopic analysis confirmed the spent cartridge cases were expelled from appellant's firearm, the firearm recovered from the scene. Police took an oral swab from appellant to obtain a DNA standard, which was then compared to swabs from the firearm. BCI analysts confirmed appellant's DNA is consistent with the major contributor of DNA from the swabs of the firearm.

{¶39} Upon examination of the rear of the Neighbors' house, police found a visible hole where a bullet struck the house. Inside Jane Doe's bedroom, the window screen and sash sustained visible damage. Jane and Mary Doe, and John Roe, all testified the damage was not present before the standoff; nor did they give appellant permission to shoot at their house. No bullet was found in Neighbors' house.

{¶40} Appellant was charged by indictment with five counts of attempted murder pursuant to R.C. 2923.02, 2903.02(B) and (D), and 2929.02(B), all felonies of the first degree and each accompanied by a firearm specification pursuant to R.C. 2941.145(A); five counts of felonious assault pursuant to R.C. 2903.11(A)(2) and (D)(1)(a), all felonies of the first degree and accompanied by firearm specifications pursuant to R.C. 2941.145(A); one count of harassing a police dog pursuant to R.C. 2921.321(B)(4) and (E)(2), a misdemeanor of the second degree; one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D)(1)(a), a felony of the second degree accompanied by a firearm specification pursuant to R.C. 2941.145(A); one count of improperly discharging a firearm at a habitation or into a school safety zone pursuant to R.C. 2923.161(A)(1)(C), a felony of the second degree accompanied by a firearm specification pursuant to R.C.

2941.145(A); one count of having weapons while under disability pursuant to R.C. 2923.13(A)(3) and (B), a felony of the third degree; one count of aggravated menacing pursuant to R.C. 2903.21(A) and (B), a felony of the fifth degree; and one count of possession drug abuse instruments pursuant to R.C. 2925.12(A) and (C), a misdemeanor of the second degree.

{¶41} Appellant entered pleas of not guilty and filed a motion for a plea of not guilty by reason of insanity. Appellant also filed motions for competency examination and for insanity at the time of the offense. The trial court ordered a competency evaluation regarding appellant's ability to stand trial, along with an evaluation of his mental condition at the time of the offense. Appellant withdrew the motions following issuance of a report and a competency hearing.

{¶42} Appellee moved to dismiss the five counts of attempted murder and the single count of aggravated menacing; the trial court granted the motion.

{¶43} The matter proceeded to trial by jury and appellant was found guilty upon five counts of felonious assault as to victims Hampton, Kruger, Jatich, Schilling, and Burns, along with the firearm specifications; one count of harassing a police dog; one count of felonious assault as to appellant's neighbors and the accompanying firearm specification; one count of improperly discharging a firearm at or into a habitation and the accompanying firearm specification; one count of having weapons while under disability; and one count of possession drug abuse instruments. The trial court sentenced appellant to an indefinite prison term of 19 to 24 years.

{¶44} Appellant now appeals from the trial court's judgment entry of conviction and sentence.

{¶45} Appellant raises two assignments of error:

**ASSIGNMENTS OF ERROR**

{¶46} "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT, AND THE CONVICTION MUST BE REVERSED."

{¶47} "II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED."

**ANALYSIS**

I., II.

{¶48} Appellant argues appellee produced insufficient evidence at trial to prove he had the requisite intent to attempt to cause physical harm to police officers, Jane Doe, and the police K-9 because he was in the midst of a mental health crisis. In other words, appellant argues he was a danger to himself but not to others. Appellant further argues there is "no evidence" he discharged the firearm into Jane Doe's residence.[1]

{¶49} Regarding the police officers and Jane Doe, appellant was found guilty upon a total of six counts of felonious assault pursuant to R.C. 2903.11(A)(2), which prohibits knowingly causing or attempting to cause physical harm to another by means of a deadly weapon or dangerous ordnance. R.C. 2901.22(B) defines "knowingly" as follows:

> A person acts knowingly, regardless of purpose, when the
>
> person is aware that the person's conduct will probably cause a

---

[1] Appellant does not challenge his convictions upon one count of having weapons while under disability and one count of possession of drug abuse instruments; nor does he specifically address the firearm specifications upon which he was also found guilty.

certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶50} Regarding the K-9 police dog, appellant was found guilty upon one count of harassing a police dog pursuant to R.C. 2921.321(B)(4), which prohibits recklessly engaging in any conduct that is likely to cause serious physical injury or death to a police dog. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

{¶51} Finally, appellant challenges his conviction upon one count of improperly discharging a firearm at or into a habitation pursuant to R.C. 2923.161(A)(1), which prohibits any person from knowingly discharging a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual without privilege to do so. "Knowingly" is defined supra.

{¶52} Appellant first argues there is no evidence he shot at officers with any intent to hurt them. Appellee's evidence at trial, in the form of witness testimony and physical

evidence recovered from the scene, established appellant fired bullets from his weapon out the window of his house in the direction of officers stationed outside near the driveway and garage, and into Jane Doe's window. Appellant's intention to harm officers was evidenced by his threats to shoot the officers and to shoot the K-9. Throughout the standoff, appellant threatened he would kill himself and police. Regardless of whether drug abuse or a mental health crisis triggered appellant, he threatened officers repeatedly and shot at them. Firing a weapon into an area without knowledge of its occupants is sufficient to establish a knowing attempt to cause physical harm. *State v. Hill*, 6th Dist. Lucas No. L-18-1160, 2020-Ohio-1237, ¶ 19.

{¶53} Appellant discounts Kruger's testimony that he observed appellant in the bathroom window, and then saw a muzzle flash. The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Nash*, 5th Dist. Stark No. 2014CA00159, 2015-Ohio-3361, ¶ 20, citing *State v. Cunningham,* 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, at ¶ 51–57. Appellant also points to Schilling's testimony that he and the K-9 moved to a position of "hard cover" before the muzzle flash from the window and therefore the officer and K-9 could not have been at risk of serious physical harm. The Supreme Court of Ohio has addressed what conduct constitutes a substantial step demonstrating an intent to commit a felonious assault. In *State v. Brooks*, 44 Ohio St.3d 185, 542 N.E.2d 636 (1989), the court held "[t]he act of pointing a deadly weapon at another, without additional evidence regarding the actor's intention, is insufficient evidence to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2)." *Id.* at syllabus.

{¶54} Nonetheless, the act of pointing a gun at another "coupled with a threat, which indicates an intention to use such weapon," is sufficient evidence to support a conviction for felonious assault. *State v. Green*, 58 Ohio St.3d 239, 569 N.E.2d 1038 (1991), syllabus. The record in this case is replete with appellant's threats to harm or kill officers in addition to himself, as documented in the statement of facts.

{¶55} Upon a thorough review of the record, we find that there was sufficient evidence presented to demonstrate that appellant's actions were strongly corroborative of an intent to cause physical harm. *State v. Kehoe*, 133 Ohio App.3d 591, 599–600, 729 N.E.2d 431, 437 (12th Dist.1999). That appellant fired upon the officers only proves such an intent. *Id.*

{¶56} Our review of the record established appellant's threats, the officers' locations at the scene, the bullet fragments in the driveway, the testimony of the officer who observed shots fired from the window, the testimony of Kruger and Jatich that they saw shots fired from the window, and the close proximity of Kruger and Jatich to Hampton, Schilling, and Burns is more than sufficient evidence to allow a reasonable jury to conclude police were within the direction and range of appellant's gunfire and susceptible to physical harm in the line of fire.

{¶57} Appellant argues there was no evidence that he pointed his weapon directly at police and Neighbors' house. Simply pointing a gun at another is not enough to prove an attempt to cause physical harm. *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636, 642 (1989). "Something more" is required to establish intent. *State v. Turner*, 10th Dist. No. 97APA05-709, 1997 WL 798770 (Dec. 30, 1997), internal citation omitted. Verbal threats or other demonstrative evidence which are perceived by a reasonable

person under the circumstances to be a threat could fulfill the requirement for additional evidence. *State v. Green*, 58 Ohio St.3d 239, 241, 569 N.E.2d 1038, 1041 (1991). That threat must indicate an intention to use that weapon. *Id.* at 241-242.

{¶58} A jury can infer intent from the defendant's actions, even though the defendant claims he lacked the requisite intent. *Turner*, supra. The trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is to produce death. *Id.*, internal citations omitted. Shooting a gun in the direction of other people has the likely result of causing death; "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." *Id.*, internal citation omitted.

{¶59} We examined the issue of the appellant's intent in a police-standoff situation in *State v. DeWalt*, 5th Dist. Stark No. 2020CA00031, 2020-Ohio-5504, at ¶ 21-27. A "barrage" of shots was fired from inside the appellant's residence as police officers scrambled for cover. Viewing the evidence in a light most favorable to the prosecution, we concluded a reasonable person could have found beyond a reasonable doubt that the appellant in that case caused or attempted to cause physical harm to police by means of a deadly weapon or dangerous ordnance. *Id.*, 2020-Ohio-5504, ¶ 27.

{¶60} The evidence also established appellant attempted to cause serious physical harm to Jane Doe, the neighbor, and fired at or into her habitation. As Jane looked out her bedroom window, the window was simultaneously damaged, as if from a bullet, even though no bullet was recovered. Appellee presented evidence of the damage to the window. Appellant summarily argues the damage may have been caused by debris from the gas canisters fired by police, but there is no evidence in the record

supporting this theory. One who shoots into a residence known to be occupied, and actually occupied, may be convicted of felonious assault irrespective of whether the shot strikes the occupants therein. *State v. Fisher*, 6th Dist. Lucas No. L-22-1150, 2023-Ohio-2088, ¶ 24, citing *See State v. Elko*, 8th Dist. Cuyahoga No. 83641, 2004 WL 2340258, 2004-Ohio-5209, ¶ 54, *abrogated in part by State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498 ("Firing a pistol into a window, without knowing who could be behind it, satisfies a knowing attempt to cause physical harm."); *State v. Gowdy*, 6th Dist. Erie No. E-06-071, 2009 WL 223883, 2009-Ohio-385, ¶ 28-29 (applying *Elko* and affirming two felonious assault convictions where the defendant fired shots through the bedroom window of a residence where two individuals were sleeping, even though the defendant allegedly lacked any knowledge as to who occupied the residence).

{¶61} Regarding the K-9, the level of intent is lower for attempting to cause harm to a police dog; appellee only had to establish appellant recklessly engaged in any conduct likely to cause serious physical injury or death to a police dog. Appellant summarily argues there is no evidence he intended to hurt the dog, but when Schilling gave the K-9 the "bark" command, the dog barked repeatedly and to get appellant's attention, telling him the dog would be released into the house if appellant refused to surrender and the dog would bite. Appellant still refused to surrender and threatened to shoot the dog. Appellant also threatened, "You know what? If you guys came in I'd fucking shoot you, too. I didn't do nothing wrong. I'm just defending myself." Appellant's threats to officers and the K-9 led Wilkes to contact his lieutenant and seek authorization for the SWAT team to respond.

{¶62} Officers repeatedly told appellant to come to the front door because they had a warrant for his arrest. Appellant responded, "It's gonna be a real bad day. And I'm gonna wind up dead and so are one of you mother fuckers." The exchange lasted almost ten minutes. Schilling declined to send the K-9 into the house because at 1:39 a.m., appellant fired off a round.

{¶63} Upon hearing the gunshot, the situation intensified. Schilling moved to a position of hard cover behind a vehicle at the corner of a detached garage and put the K-9 away. The dog remained in the cruiser close to Kruger, Jatich, Hampton, Schilling, and Burns when appellant fired the weapon in their direction.

{¶64} Appellant also points to minor inconsistencies in the witnesses' accounts. While the jury may take note of inconsistencies and resolve or discount them accordingly, such inconsistencies alone do not render a conviction against the manifest weight or sufficiency of the evidence. *State v. Wolters*, 5th Dist. No. 21CA000008, 2022-Ohio-538, 185 N.E.3d 601, ¶ 20, citing *State v. Craig*, 10th Dist. Franklin App. No. 99AP-739, 2000 WL 297252, (Mar. 23, 2000) *3, internal citation omitted. We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison,* 49 Ohio St.3d 182, 189, 552 N.E.2d 180 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶65} The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true.

*State v. Miller*, 5th Dist. No. 17 CAA 08 0062, 2018-Ohio-3481, 118 N.E.3d 1129, ¶ 47, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, 2003 WL 723225, ¶ 21, internal citations omitted.

{¶66} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost his way nor created a miscarriage of justice in convicting appellant. Based upon the foregoing and the entire record in this matter, we find appellant's convictions are not against the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matter. The jury heard the witnesses, evaluated the evidence, and was convinced of appellant's guilt.

{¶67} Our review of the entire record reveals no significant inconsistencies or other conflicts in appellee's evidence which would demonstrate a lack of credibility of the witnesses sufficient to find the jury lost its way to finding appellant guilty. *Miller*, supra, 2018-Ohio-3481, ¶ 49.

{¶68} Appellant's two assignments of error are overruled.

## CONCLUSION

{¶69} Appellant's two assignments of error are overruled and the judgment of the Stark County Court of Common Pleas is affirmed.

By: Delaney, P.J.,

Baldwin, J. and

King, J., concur.